[No. 7578. *En Banc.* October 4, 1909.]

# L. F. BOOTHE, *Appellant*, v. SUMMIT COAL MINING COMPANY et al., *Respondents.*[1]

CORPORATIONS—OFFICERS—SALARY—INCREASE BY OWN VOTE AND SUBSERVIENT TRUSTEES. An increase in the salary of an officer of a corporation who was a trustee and owned half of the stock, through his own vote and the votes of trustees subservient to him, is fraudulent and illegal; and this, regardless of the value of the services, where it was improperly made in violation of an agreement with the owner of the other half of the stock.

CORPORATIONS—RECEIVERS—SOLVENCY—DEADLOCK AND DIFFERENCES. A temporary receiver should be appointed for a corporation, though solvent and prosperous, where two persons at bitter enmity with one another, each held one-half of the stock, and through a deadlock and inability to elect officers, one of them, as a hold-over trustee, with two subservient dummies, seized complete control of the corporation, excluded his' rival from all participation in the business, refused him an inspection of the books, and illegally increased his own salary, and it appears that a new board cannot be elected, and there is no prospect of adjusting the differences; and the receivership will be made permanent in case the differences cannot be adjusted within a time limited.

CONTRACTS — CONSTRUCTION—"PROFITS"—DEPRECIATION OF PLANT. Where the owner of all of the stock of a coal mining corporation sold one-half thereof under an agreement reciting that the profits to be divided did not include the profits in the business of the mining company made prior to April 1st, 1906, by "profits" the parties understood and meant that which would remain after deducting the cost of operation from the income of the mine, and no deduction for depreciation in the plant or machinery was contemplated (CROW, MOUNT, FULLERTON, and DUNBAR, JJ., dissenting).

Appeal from a judgment of the superior court for Kittitas county, Kauffman, J., entered December 21, 1907, in favor of the defendants, after a trial on the merits before the court without a jury, dismissing an action for equitable relief. Reversed.

*Kerr & McCord,* for appellant.

*Ballinger, Ronald, Battle & Tennant,* for respondents.

[1]Reported in 104 Pac. 207.

CROW, J.—This action was commenced by L. F. Boothe, a stockholder, against Summit Coal Mining Company, a corporation, Robert J. Linden, and others, to compel Robert J. Linden to account for moneys appropriated, to obtain the appointment of a receiver, and for other equitable relief. The trial judge dismissed the action. The plaintiff has appealed.

From the evidence we find that the Summit Coal Mining Company was incorporated in this state in October, 1903, with $50,000 capital stock divided into 500 shares of $100 each; that it owns a coal mine in Kittitas county, equipped with an operating plant; that on May 19, 1906, the respondent Robert J. Linden owned all of the capital stock except fifty shares held by one James Cronin, and some two or three other shares; that on said date the appellant, L. F. Boothe, purchased 250 shares from R. J. Linden, and also purchased a half interest in a merchandise business in Portland, Oregon; that later the merchandise business was resold to Linden; that Linden executed and delivered to Boothe a receipt reading as follows:

"Portland, Oregon, 5-19-06.

"Recd. from L. F. Boothe Fifteen Thousand Dollars as part payment on Two Hundred and Fifty shares of Summit Coal Mining Company stock at One hundred Dollars per share, and a one-half interest in my merchandise business representing one-half the outstanding a-cs of said merchandise business existing on May 1st, '06, and one-half the merchandise on hand on said date, the profits accruing in the business of the Summit Coal Mining Company from and after the first day of April, 1906, to be divided in accordance with the amount of stock or interest held and is not to include profits made prior to April 1st, 1906; all debts contracted by the Summit Coal Mining Company and any debts connected with my merchandise business prior to said date to be assumed and paid by R. J. Linden; this does not include credit to account of R. J. Linden on books of Summit Coal Mining Company.

"(Signed)   R. J. Linden."

that the credit of R. J. Linden then standing on the books was about $2,900; that Boothe and Linden agreed they should each draw a salary of $125 per month, from the min-

ing company, for services to be rendered; that Boothe was
to become a trustee and officer; that he completed his pay-
ments on the stock in July, 1906; that a certificate for 248
shares was at his request transferred to him, and two cer-
tificates for one share each to his wife and son; that Robert
J. Linden purchased the stock of James Cronin, and that
the entire capital stock was then owned, 250 shares by Boothe,
and 250 shares by R. J. Linden who held 248 shares in his
own name, and two shares in the names of others; that when
Boothe purchased his stock, Robert J. Linden, Pearl K. Lin-
den, his daughter, and James Cronin were trustees; that
Cronin sold his stock to Robert J. Linden on June 19, 1906;
that on November 10, 1906, after the difficulties hereinafter
mentioned had commenced, the remaining trustees, Robert
J. Linden and Pearl K. Linden held a special meeting at
which they elected the respondent G. R. Percival as trustee,
he then holding one share of stock which had been trans-
ferred to him on the preceding day by Emma Linden, wife of
Robert J. Linden; that shortly after Boothe purchased his
250 shares he commenced active work, in connection with
Robert J. Linden, in operating the coal mine; that at his
suggestion a new tramway was installed; that differences
arose between him and Robert J. Linden which became so
bitter that Linden excluded Boothe from any participation
in the affairs of the corporation, assumed sole charge, and
completed the tramway; that Boothe then demanded an in-
spection of the corporation books, which was at first refused;
that later he was reluctantly permitted to inspect the books,
with the aid of an expert, from and after April 1, 1906, but
positively prohibited from seeing them for any prior period;
that the books when inspected disclosed that at different
times from March 30, 1906, to December 31, 1906, Robert
J. Linden had caused himself to be credited with $6,515.25,
$1,539.37, and $1,101.24 which he now claims he was entitled
to receive as profits earned prior to April 1, 1906; that at
one time when Boothe was inspecting the books, he and Rob-

ert J. Linden became engaged in a personal encounter, resulting from their bitter enmity and irreconcilable differences; that an annual meeting of the stockholders was held in Seattle on January 14, 1907, the minutes of which read as follows:

"The regular stockholders' meeting of the Summit Coal Mining Company met, pursuant to adjournment this A. M., at the office of Ballinger, Ronald, Battle & Tennant in Seattle, Washington, at this the hour of 1:30 o'clock P. M. this day, there being present the following stockholders either in person or by proxy, and representing the following number of shares:

<div style="padding-left:3em">

L. F. Boothe................248 shares
D. P. Boothe................ 1    "
Charline Boothe ............ 1    "
   by L. F. Boothe, her proxy
R. J. Linden................248 shares
P. K. Linden................ 1    "
G. R. Percival.............. 1    "

</div>

being all of the stockholders and representing all of this stock of this corporation.

"Whereupon, the meeting having been called to order by the president, he stated that this being the time for the election under the by-laws, of a board of trustees for the ensuing term, nominations for the office of trustees for the ensuing year are now in order, whereupon the following three persons were nominated by L. F. Boothe: L. F. Boothe, Charline Boothe and D. P. Boothe. G. R. Percival then nominated the following: R. J. Linden, Pearl K. Linden and G. R. Percival.

"Upon vote being taken, it was found that L. F. Boothe, Charline Boothe and D. P. Boothe each received 250 votes; that R. J. Linden, P. K. Linden and G. R. Percival each received 250 votes, whereupon the president declared that no person having received a majority, there was no election.

"Whereupon L. F. Boothe asked if an annual report had been made by the officers and was ready to be read. The president informed the stockholders that such report was not ready, but promised that he would prepare the same as early as possible and file the same of record, furnishing a copy thereof to Mr. L. F. Boothe.

"At this point Hon. Carroll B. Graves, on behalf of the 50% of the stock held by L. F., D. P. and Charline Boothe, announced that under the circumstances the stock held by the Boothe's would continue to be voted for the said nominees for trustees made by L. F. Boothe. A like announcement was made by the holders of the other 50% of the stock to the effect that that would be voted to the nominees for trustees made by G. R. Percival.

"Thereupon said Graves suggested as a compromise that R. J. Linden name one and L. F. Boothe name one person who should be elected trustees, and that the said Linden and Boothe should then select a third party who should select or name the third person to be elected as trustee, which suggestion was declined by the holders favoring the election of the persons nominated by said Percival.

"Thereupon a motion was made and seconded to adjourn, which motion, being duly put, was unanimously carried."

That immediately after the adjournment of the stockholders, the annual meeting of the holding-over board of trustees was convened, at which, without electing officers or transacting any other business, the following resolution was adopted:

"Resolved that the salary of R. J. Linden as President-Treasurer and general manager of the business of this corporation be made four hundred dollars per month for the year 1907."

That Linden had drawn $125 per month from and after Boothe's purchase of stock, until the annual meeting, and thereafter drew $400 per month; that Boothe was paid $125 for one month only, and that in July, 1907, the appellant, Boothe, commenced this action. Other facts shown by the evidence will be hereinafter stated.

The appellant contends that the trial court erred, (1) in refusing the appointment of a receiver; (2) in refusing a decree requiring Robert J. Linden to restore to the corporation moneys misappropriated by him; (3) in rulings on the evidence; and (4) in dismissing the action. These assignments will be considered together.

There is no question but that Robert J. Linden is in complete control of the corporation, which he is conducting under the authority of a pliant board of trustees, consisting of himself, his daughter, and one other person, the two latter being subservient to his will, and holding over by reason of the inability of the stockholders to elect their successors. Although legal trustees, they are used by Robert J. Linden as an instrument to retain control and exclude Boothe from participation in the corporation. Linden and Boothe each own one-half of the capital stock; they are in irreconcilable conflict; the former is in control, and it is impossible to change this situation by the election of new trustees. Corporations are presumed to be governed by a board and officers representing a majority of the capital stock, but here we find a board consisting of one active and two subservient, dummy trustees, sustained by one-half of the capital stock or less than a majority, and we should carefully scrutinize their acts.

The respondent Robert J. Linden contends that he was entitled to the three credits entered on the books as profits earned prior to April 1, 1906. The dispute between him and Boothe arises from their difference of opinion as to what should constitute profits. The receipt signed by Linden disclosed their agreement as to profits earned prior to April 1, 1906. It stipulated that all such profits should be retained by him. The trial was adjourned to afford the appellant his first inspection of the books covering periods prior to April 1, 1906. They disclosed that in October, 1904, the respondent R. J. Linden and one Goodsell acquired all of the capital stock, and made entries placing a valuation of $25,000 on the real estate or mine, and $25,000 on the mining plant, tramway, machinery and fixtures. Linden insists that he is entitled to estimate profits by deducting from the total receipts from all sales of coal made prior to April 1, 1906, the operating expenses only. The appellant contends that a further deduction should be made for depreciation in the

value of the mining plant, machinery, tramway, etc., and offered evidence to show the extent of such depreciation prior to April 1, 1906, which evidence was at first admitted and then stricken. Mr. Cook in the 2d vol. of the 6th edition of his work on Corporations, at § 546, p. 1485, discussing profits, says:

"A proper sum must first be expended or set aside for repairs and reconstruction to replace depreciation due to wear and tear. In other words, the fund available for dividends is ascertained by taking into account the cost of repairs and a reasonable allowance for depreciation, giving credit for all actual permanent improvements."

We think this rule should be applied to the operating plant,* but not to the real estate or mine itself, which must depreciate by reason of the constant removal of the coal deposits. In the same section Mr. Cook further says:

"But in the case of a company owning patent rights, or of a mining company whose product when once used can never be replaced, it is not necessary to set aside funds for the purpose of purchasing new patents or a new mine."

In a foot note Mr. Cook makes a quotation from Greene on Corporation Finance, which is especially pertinent here. If the respondent corporation makes dividends on the theory advanced by the respondent Linden, and so continues, it will ultimately become necessary for it to incur indebtedness for a new plant to continue the operation of its mine. The entries made and claimed by the respondent Linden, as profits earned prior to April 1, 1906, were arbitrary, improper, and prejudicial to the appellant. We cannot determine from the record now before us how much credit, if any, he was entitled to receive, as he introduced no evidence on the subject of depreciation after the appellant's evidence, which was competent, had been stricken.

The action of Robert J. Linden and his subservient trus-

*Note: The decision on this point appears to be overruled by the concurring opinion of the Chief Justice, *post* p. 180, Rep.

tees in raising his salary to $400 per month, was arbitrary and illegal. When Boothe and Linden, as owners of all of the capital stock, agreed upon a salary of $125 to each of them, ratification of their agreement by the board would have been unobjectionable. The raise of Linden's salary was undoubtedly made at his instance and request. The annual meeting of stockholders had just been held, at which every share of stock was represented. If Linden had intended to be fair in demanding additional salary he would have requested action by the stockholders. There is no evidence of his having done so. He permitted the stockholders to adjourn, and immediately caused the holding-over board of trustees, consisting of himself and his two dummies, to make a contract in which he himself was financially interested.

In *Schaffhauser v. Arnholt & Schaefer Brewing Co.*, 218 Pa. 298, 67 Atl. 417, the supreme court of Pennsylvania said:

"The generally accepted rule, applicable to such cases, is that the voting of a salary or compensation to a director, who either is or is not an officer of the board, must be entirely free from fraud, actual or constructive, and that the action is illegal, if it is determined by the vote of the director, or officer, whose salary is thus increased."

The only way in which the respondent Linden's salary could have been increased without his own vote, was by his two dummy trustees who, although trustees in legal form, were entirely subservient to his will. In *Strouse v. Sylvester*, 134 Cal. xx, 66 Pac. 660, it was held that an increase of the salary of an officer of a corporation, made by the vote of trustees subservient to him, was fraudulent and illegal. From all the evidence and circumstances before us, we conclude that Linden's raise of salary was made to divert profits of the corporation to himself, without due regard to the rights of Boothe, and that Linden should account for all salary received by him, in excess of $125 per month. Evidence was offered to show that his services were worth $400 per month. This evidence was contradicted, but, under the circumstances,

we will not enter upon its consideration, the raise having been improperly made in violation of Linden's agreement with Boothe, and without the latter's knowledge or consent.

Enough has been said to show that the respondent Robert J. Linden, by means of his subservient board of trustees, has seized possession of the corporation and all of its business affairs; that he has excluded the appellant from any participation therein; that he is conducting it to suit himself, and directing its policies; that he refused appellant an inspection of the books to which he was entitled; that the stock is equally divided in ownership between the appellant and himself; that a new board of trustees cannot be elected; that bitter enmity and irreconcilable differences exist between the appellant and respondent Robert J. Linden; that no prospect of adjusting these differences seems to exist; and the question now presented for our consideration is whether these conditions justify the appointment of a receiver.

The respondents contend that the corporation is prosperous; that it has refunded to Boothe $2,000 advanced by him towards the installation of the new tramway, and to the respondent Robert J. Linden a much larger sum advanced for the same purpose; that since January 1, 1907, it has paid a dividend of $5 per share; that on October 1, 1907, it had in cash and good accounts $15,000 surplus and undivided profits; that no court of equity will appoint a receiver over a solvent corporation in the control of a governing body legally authorized to transact its business; that there is no statutory authority for such an appointment; and that in the absence of statutory authority, a court of equity cannot, by the appointment of a receiver, dissolve a solvent corporation controlled by a harmonious governing body. In support of these contentions they cite, with others, the following authorities: 10 Cyc. 988; High, Receivers (2d ed.), § 288; 3 Cook, Corporations (5th ed.), § 746; *Wallace v. Pierce-Wallace Pub. Co.*, 101 Iowa 313, 70 N. W. 216, 63 Am. St. 389, 38 L. R. A. 122; *Little Warrior Coal Co. v. Hooper,*

105 Ala. 665, 17 South. 118; *Benedict v. Columbus Const. Co.*, 49 N. J. Eq. 23, 23 Atl. 485; *Edison v. Edison United Phonograph Co.*, 52 N. J. Eq. 620, 29 Atl. 195; *Einstein v. Rosenfeld*, 38 N. J. Eq. 309; *Republican Mountain Silver Mines v. Brown*, 58 Fed. 644; *Miller v. Kitchen*, 73 Neb. 711, 103 N. W. 297; *Folger v. Columbian Ins. Co.*, 99 Mass. 267, 96 Am. Dec. 747.

There is no question as to the correctness of the elementary doctrine urged by the respondents. The authorities mentioned announce sound equitable principles which were applied to the facts there involved and stated. Our statute, Bal. Code, § 5456, subd. 6 (P. C. § 575), authorizes the appointment of a receiver, "When in the discretion of the court, it may be necessary to secure ample justice to the parties." Courts of chancery are organized for the purpose of doing justice and affording equitable relief whenever in good conscience it should be awarded. Would a court of equity in the furtherance of justice and in the exercise of its sound discretion be justified in directing the appointment of a receiver over the respondent corporation, or should the appellant be turned out of court without other relief than a temporary accounting, with the certainty that, while present conditions continue, he will be compelled to return and incur the expense of repeatedly seeking the aid of the chancellor to secure further accountings and protection of his rights as a stockholder? Although the appellant and R. J. Linden each own one-half of the capital stock, the latter is in exclusive possession. He arbitrarily conducts the corporation business, makes book entries, declares or refuses dividends, raises his own salary, retains his subservient trustees in office, and through them performs such corporate acts as he chooses. He and Boothe are not partners, yet their relative position, created by their contract of sale, is kindred to that of partners. Linden has thereby obtained absolute control of $25,000 in value of the appellant's estate, which he is arbitrarily handling without consulting the appellant or

granting him the least consideration.   Such a condition is
an intolerable one for the appellant, and one that would not
be permitted in a partnership. Were their positions changed,
Linden would doubtless demand a receiver with as much.
energy as he now opposes one.   If they were partners, a
receiver would unquestionably be granted.   No rights of
creditors, other stockholders, or third parties are here in-
volved.   The only real parties in interest are Boothe and
Robert J. Linden.   As above stated, their position is kindred
to that of partners.   Present conditions will undoubtedly
continue unless a court of equity affords relief.   Should they
continue?   We think not.   After a most diligent research we
have been unable to find any case similar to this.   It is *sui
generis*.   Its facts distinguish it from *Secord v. Wheeler
Gold Min. Co.*, 53 Wash. 620, 102 Pac. 654, cited by re-
spondents.   A court of equity in deciding whether a receiver
shall be appointed over a solvent corporation must exercise
its sound discretion, in view of the particular facts and cir-
cumstances presented.

In *State ex rel. Conlan v. Oudin & Bergman Fire Clay
Min. & Mfg. Co.*, 48 Wash. 196, 93 Pac. 219, we said:

"The rival stockholders herein seem unable to agree as to
the management and control of the corporate affairs.   This
is the eighth appeal to this court by these parties or those
interested in this matter, and we are informed that another
appeal is now on the way.   As the stock is held entirely by
three stockholders, two of whom are husband and wife, con-
siderations do not obtain which might if there were numerous
stockholders not directly responsible for the controversy and
the present condition of the corporation.   We see no reason
for not dissolving this corporation which for over four years
has been impotent and unable to legally transact any busi-
ness on account of the controversy and ill-feeling existing be-
tween the parties who own each half of the stock."

In the instant case, there is no control of the corporation
by a board of trustees, sustained by a majority of the stock,
although originally the present board may have been legally
elected.   In practical operation there is no deliberative board.

12—55 WASH.

R. J. Linden has as full, complete, and dictatorial control as did Oudin in the case cited, and although the corporation here involved is solvent, such a condition is inequitable and should not be permitted. It does violence to the elementary idea that a corporation is to be controlled by a governing board representing a majority of the stock. No majority is in control, nor can it obtain control. The deadlock is complete, absolute, to all appearances permanent, and R. J. Linden arbitrarily controls and manages the estate of Boothe, whose rights are, and should be, equal to his. The following cases, while not exactly parallel, are pertinent, and may be consulted with much profit: *Hampton v. Buchanan,* 51 Wash. 155, 98 Pac. 374; *Sternberg v. Wolff,* 56 N. J. Eq. 389, 39 Atl. 397, 67 Am. St. 494; *Gibbs v. Morgan,* 9 Idaho 100, 72 Pac. 733; *Hall v. Nieukirk,* 12 Idaho 33, 85 Pac. 485, 118 Am. St. 188.

In *Gibbs v. Morgan, supra,* the supreme court of Idaho well said:

"The early doctrine that the affairs of a corporation could not be inquired into except by permission of the attorney general, and that courts of equity should not interfere with the power and authority of the directors of a corporation because that would result in its dissolution has been modified to meet existing conditions. A large part of the business of the world is done through corporations, and it was held in *Columbia Athletic Club v. State,* 143 Ind. 98, 52 Am. St. Rep. 407, 40 N. E. 914, 28 L. R. A. 727, that the courts of equity should adapt their practice as far as possible to the existing state of society, and apply its jurisdiction to all those new cases which, from the progress daily making in the affairs of men, must continually arise, and should not from too strict an adherence to the forms and rules established under very different circumstances, decline to administer justice and to enforce rights for which there is no other remedy."

Mr. Cook in § 746 of the 6th edition of his work on Corporations says:

"A receiver will not be appointed at the instance of a stockholder, even though mismanagement is charged, there

being no fraud, and no danger of insolvency. There is a limit, however, to this rule. The powers of courts of equity to appoint receivers are very broad. Thus a court of equity has power to appoint a receiver where there is such fraud or dissension as to make it impossible for the corporation to carry on its business honestly and to the advantage of its stockholders. Such receivership, however, will be granted only in extreme cases and will be limited in time and extent, so far as the circumstances will permit.

"There are numerous cases to the effect that the court will appoint a receiver where it is evident that a continuation of the business will be impracticable or inequitable. The supreme court of Missouri has said: 'That solvent corporations are wrecked for purely selfish and illegal purposes, that minority interests are "frozen out," that business immorality has run amuck under the assumption that courts are powerless, is too true. But the assumption is wrong. Judicial hesitancy does not mean judicial atrophy or paralysis'."

While we recognize and adhere to the doctrine that a court of equity should hesitate before appointing a receiver over a solvent corporation, and should make such an appointment in exceptional instances only, yet we are constrained to hold that equity, good conscience, justice, and the rights of the parties demand such an appointment in this case. The judgment is reversed, and the cause remanded with instructions to appoint a temporary receiver for such period as the trial court may fix, within which the differences between the parties may be adjusted by themselves if possible. It is further ordered that if, at the expiration of such time, their differences be not adjusted, a permanent receiver be appointed. It is further ordered that an accounting be had, that R. J. Linden be required to return to the corporation all salary drawn by him in excess of $125 per month, and all profits withdrawn by him in excess of the amount to which he was entitled, as having been earned prior to April 1, 1906. The appellant will recover his costs on this appeal, from the respondent Robert J. Linden.

MOUNT, FULLERTON, and DUNBAR, JJ., concur.

RUDKIN, C. J. (concurring)—I concur in the opinion of Mr. Justice Crow, except in his interpretation of the word "profits" found in the written contract or receipt of May 19, 1906. In referring to the profits accruing prior to the 1st day of April, 1906, I am convinced that the parties understood and meant that which would remain after deducting the cost of operation from the income of the mine, and that no deduction or allowance for depreciation in the value of the plant or machinery was contemplated or intended. The property of the corporation was represented by its capital stock, and the plaintiff purchased the property or its representative as he found it. Profits and dividends are not necessarily synonymous terms. *Allegheny v. Pittsburgh etc. R. Co.*, 179 Pa. St. 414, 36 Atl. 161. But regardless of technical definitions, it is the duty of the court to ascertain the intention of the parties from their language and all the surrounding circumstances, and it is very apparent to my mind that no technical definition of the term profits was here intended.

GOSE, CHADWICK, PARKER, and MORRIS, JJ., concur with RUDKIN, C. J.