SALNITA CORPORATION, a corporation organized and existing under the laws of the State of Delaware, JOSEPH REALTY CORPORATION, a corporation organized and existing under the laws of the State of New Jersey, JOSEPH D. BANNON AND HUGH E. MURRAY,

*vs.*

WALTER HOLDING CORPORATION, a corporation organized and existing under the laws of the State of Delaware, CECELIA INVESTMENT COMPANY, a corporation organized and existing under the laws of the State of Illinois, MORNING TELEGRAPH, INC., a corporation organized under the laws of the State of Delaware, GENERAL NEWS BUREAU, a corporation organized and existing under the laws of the State of Illinois, MOSES L. ANNENBERG, WALTER H. ANNENBERG, JOSEPH A. MOORE, CLARENCE C. VERNAM, HERBERT KRANCER AND LEONARD M. HOWARD.

SALNITA CORPORATION, a corporation of the State of Delaware, JOSEPH REALTY CORPORATION, a corporation of

the State of New Jersey, JOSEPH D. BANNON AND HUGH E. MURRAY,

vs.

WALTER HOLDING CORPORATION, a corporation of the State of Delaware.

---

SALNITA CORPORATION, a corporation organized and existing under the laws of the State of Delaware, and JOSEPH REALTY CORPORATION, a corporation organized and existing under the laws of the State of New Jersey,

vs.

A. B. & M. CORPORATION, a corporation organized and existing under the laws of the State of Delaware, CECELIA INVESTMENT COMPANY, a corporation organized and existing under the laws of the State of Illinois, MORNING TELEGRAPH, INC., a corporation organized and existing under the laws of the State of Delaware, MOSES L. ANNENBERG, WALTER H. ANNENBERG, JOSEPH A. MOORE, CLARENCE C. VERNAM, HERBERT KRANCER AND LEONARD M. HOWARD.

---

SALNITA CORPORATION, a corporation organized and existing under the laws of the State of Delaware, and JOSEPH REALTY CORPORATION, a corporation organized and existing under the laws of the State of New Jersey,

vs.

A. B. & M. CORPORATION, a corporation organized and existing under the laws of the State of Delaware.

*New Castle, July* 31, 1933.

428

*Hugh M. Morris* and *Caleb S. Layton,* of the firm of Richards, Layton & Finger, and *G. Burton Pearson, Jr.,* (*Nathan L. Miller* and *Harold J. Gallagher,* [of Hornblower, Miller, Miller & Boston], both of New York City, of counsel), for complainants.

*William G. Mahaffy,* for defendants Walter Holding Corporation and A. B. & M. Corporation.

*Charles F. Curley,* (*Robert N. Golding,* of Chicago, Ill., of counsel), for defendants Cecelia Investment Co., and Moses L. and Walter H. Annenberg.

*Christopher L. Ward, Jr.,* of the firm of Marvel, Morford, Ward & Logan, for defendant Morning Telegraph, Inc.

THE CHANCELLOR: The corporations for which receivers *pendente lite* are sought are holding companies. Annenberg holds fifty per cent. of the voting stock of each and is in control of their management. Each has four directors in office. He and his son are on the boards of each. So are Bannon and Murray, who hold the other fifty per cent. of the voting stock. From an investment

standpoint, however, as distinguished from a voting one, the holdings of Bannon and Murray of non-voting stock exceed those of Annenberg. The ratio of ownership of the two corporations is about sixty to forty and sixty-five to thirty-five respectively in favor of Bannon and Murray as against Annenberg.

The part of the business in which the holding companies are interested and with which we are immediately concerned, is that of publishing. Through subsidiaries they publish daily newspapers which cater to the followers of horse-racing. The publications wholly controlled by them are "Daily Racing Form," published in New York City and Chicago, and "Daily Running Horse," published in New York. They own and control also a fifty per cent. interest in "The Morning Telegraph," a daily newspaper published in New York City, which specializes not only in racing news but also in theatrical and motion picture news. All three of these publications are therefore competitors.

Annenberg, Bannon and Murray have been associated together as publishers for about ten or eleven years, as I recall. They started their business in a small way, investing only one hundred thousand dollars of capital therein. The business was highly profitable. They have taken out of it several millions in dividends, and have invested more millions of profits in expanding and acquiring additional properties.

In 1932, however, they encountered certain very troublesome difficulties with the United States Government in connection with a publication called "Brevities" which was printed by one Joseph Ottenstein in one of the plants owned by "Daily Running Horse." Indictments were found against Annenberg, Bannon and Murray. These indictments were later *nolle prossed*. The returning of the indictments brought on a rather bitter controversy, Bannon and Murray taxing Annenberg with the entire responsibility for allowing "Brevities" to be published in the plant of

"Daily Running Horse," and Annenberg insisting upon his innocence in the entire matter. The bitterness engendered by that incident was not healed and the discord between the parties has continued.

It is charged by Bannon and Murray that Annenberg desired to get rid of them as associates, that he sought to buy their stock, that they refused to sell out, and that he thereupon threatened to so manage the business that it would cease to be attractive to them and that then he would get their stock at his own terms. That is the substance of the charge made by Bannon and Murray. They say that Annenberg has been conducting the business since that threat in such manner as to show him to be insidiously at work in carrying it out. They are powerless, because of the deadlocked situation both in stockholders' meetings and in the boards of directors, either to oust Annenberg from his possession of and control over the executive management which the controversy found him vested with, or to alter the allegedly destructive policies he has been pursuing. And so they ask for a receiver *pendente lite* to take possession of each of the corporations and save it from Annenberg's alleged malicious designs.

The relief asked for is drastic. It is sought at a preliminary stage of the suit. If granted, it means that this court must in the last analysis take active charge temporarily of the conduct of a going publishing business of considerable size which has hitherto been highly prosperous and which, so far as the argument discloses, I am entitled to believe continues to be of great value. A court should never wrest control of a business from the hands of those who have demonstrated their ability to manage it well, unless it be satisfied that no course, short of the violent one, is open as a corrective to great and imminent harm.

This court has on various occasions given expression to views which indicate with what delicacy of caution the

remedy of a receiver *pendente lite* should be afforded. *Gray, Atty. Gen., v. Newark,* 9 *Del. Ch.* 171, 79 *A.* 735, 739; *Ellis* v. *Penn Beef Co.,* 9 *Del. Ch.* 213, 80 *A.* 666, 669; *Thoroughgood v. Georgetown Water Co.,* 9 *Del. Ch.* 84, 77 *A.* 720; *Whitmer v. Wm. Whitmer & Sons,* 11 *Del. Ch.* 222, 99 *A.* 428, 430; *Moore v. Associated Producing & Refining Corp.,* 14 *Del. Ch.* 97, 121 *A.* 655; *Baker v. Conway,* 15 *Del. Ch.* 223, 135 *A.* 596. In order to warrant the appointment there "must be shown to be a reasonable apprehension of danger and irreparable loss to the subject-matter of the suit," as was observed by Chancellor Curtis in the *Whitmer Case, supra.* In the same case he said that the bare fact that the owner of one-half of the outstanding stock was excluded from any participation in the management, is not enough to warrant the appointment. In the earlier case of *Ellis v. Penn Beef Co., et al., supra,* Chanceller Curtis stated it to be a further rule that "a receiver will not be appointed to wind up the affairs of a corporation merely because of dissensions among stockholders, where it appears that the corporation is solvent and its business prosperous," citing *Sternberg v. Wolff,* 56 *N. J. Eq.* 555, 4: *A.* 1078, in support of his statement. The case cited by him was decided by Vice-Chancellor Pitney in 1898. After reviewing the authorities then bearing on the subject, the Vice-Chancellor announced a rule for guidance in such matters which, so far as my examination of the cases arising since that time discloses, I believe remains as sound today as then. As expressed by him (56 *N. J. Eq., page* 564, 42 *A.* 1078, 1081) that rule is as follows: the court "should not interfere by a receiver for purposes of preservation even, unless there is a present danger to the interests of the stockholders, consisting of a serious suspension of or interference with the conduct of the business, and a threatened depreciation of the value of the assets consequent thereupon, which may be met and remedied by a receiver. In other words it must appear in this as in all other such cases, that

the appointment of a receiver will serve some beneficial purpose to the stockholders."

The cases cited by the solicitors for the complainants are not, when examined, at variance with this rule. The first of them are two English cases decided on the same day by Sir R. Malins, V. C. They are *Featherstone v. Cooke*, 16 *L. R. Equity Cases* 298, and *Trade Auxiliary Co. v. Vickers*, 16 *L. R. Eq. Cases* 303. It appears that in those cases the dissensions had resulted in such injury to the company's business as to lead to its complete cessation in the former case and to violence and disorganization in the latter. Temporary relief was afforded in both cases during the short interval necessary for a meeting of the stockholders to be convened for the purpose of settling the controversy over the personnel of the management. The principle which he announced as controlling his judgment was expressed by him as follows (p. 305), the "court will not interfere with the internal affairs of joint stock companies unless they are in a condition in which there is no properly constituted governing body, or there are such dissensions in the governing body that it is impossible to carry on the business with advantage to the parties interested"—a principle which is in no sense at odds with the views of the Vice-Chancellor of New Jersey, as expressed in *Sternberg v. Wolff, supra.* Neither are the other cases cited by the solicitors for the complainants at odds with that rule. In *Boyle v. Superior Court*, 176 *Cal.* 671, 170 *P.* 1140, *L. R. A.* 1918*D*, 226, for instance, the business of the corporation was under enforced suspension due to dissensions; in *Boothe v. Summit Coal Mining Co.*, 55 *Wash.* 167, 104 *P.* 207, 19 *Ann. Cas.* 1255, there was fraud practiced by the head of the management, and in *Eureka Coal Co. v. McGowan*, 72 *Colo.* 402, 212 *P.* 521, the report states the corporation to have been mismanaged—whether under circumstances amounting to fraud, the opinion does not say. Because of the meagreness of the report that case is not of much assistance.

So far as my investigations reveal, a receiver *pendente lite* for a corporation actively functioning is never to be justified except under circumstances that show an urgent need for immediate protection against injury either in the course of actual infliction or reasonably to be apprehended. As the remedy is a stringent one and fraught often times when afforded with the possibilities of as much if not more harm than that which it seeks to avoid, it should be applied with scrupulous care. Only emergent situations can evoke its application.

With these principles in mind, what is the answer I should make to the pending motions? Certainly if it had not been for the alleged threats which Annenberg is charged with having uttered, every act which he has done in the management of the newspapers and every policy he has insisted upon pursuing could be referred to a perfectly honest exercise of business judgment. The complainants disagree with him as to the wisdom of his course. But they take the view and appear very earnest in entertaining it, that Annenberg's policies are so palpably at variance with sound business judgment, that they cannot be accounted for as honestly entertained by him, and that they must therefore be explained on the theory that they are but the visible steps he is taking to carry out his alleged malevolent threats of destruction of the business. Of course if that were true, the court should without hesitancy wrest the management from him and place it in the hands of a conserving receiver.

But I am unable to persuade myself on the present showing that the motives underlying the actions of Annenberg in the management of the business are tainted with the malice charged against him. I shall not discuss the details of his management that have been pointed out by the complainants as sustaining their charge of malevolence on Annenberg's part. I listened to them discussed throughout a long day of argument and I believe I have a fair

understanding of them. I am not disposed to prolong this memorandum by a discussion of the several headings under which they fall. I have tried to place myself in the position he was in and I have asked myself the question—"Now what policy would I adopt in the face of this and that situation?" And in each instance I am bound to say that I might very well have adopted the exact policy he adopted as the best one. At all events the ones he adopted are not so plainly unwise as to be irreconcilable with honest, and what appears to me to be intelligent, judgment. In saying that, I am for the moment exonerating Annenberg from responsibility for the action of the "Morning Telegraph" in its newly adopted policy of accepting the sort of "tout" advertising which it is shown that that paper has adopted. Advertising of that sort is dishonest and no one can approve it. But I am not satisfied at present that Annenberg can stop it. In making the statement I did a few sentences back, I meant it to refer to those matters of management in connection with "Daily Racing Form" and "Daily Running Horse" for which Annenberg is clearly responsible. The matters that constitute the differences of opinion between the parties are highly debatable and Annenberg's manner of handling them cannot, on the present showing, be said by me to be such as to indicate that he was animated by a desire to inflict damage upon the properties over which he was and is in charge.

That being so, I come down to this—should a receiver *pendente lite* be appointed or an injunction issued in the case of an active and prosperous corporation simply because of dissensions among its owners over questions of business policy? Now on a question of that sort, no one I take it would for a moment contend that a court would be justified in interfering.

I am of the opinion that the drastic remedies sought at this preliminary stage of the case should be refused. In reaching this conclusion I do not of course mean to inti-

mate anything as to what my views would be with respect to the matters of fact mooted in the affidavits in the light of a fuller hearing and with the opportunity for more deliberate examination. Nor do I care to be understood as impliedy revealing any attitude upon the important question of law which, if these cases proceed, will eventually be before the court for decision, viz., the question of whether Annenberg will be permitted indefinitely to enjoy his present position of power, which at the argument I took occasion to describe as fortuitous, to the complete exclusion of the complainants who possess one-half of the voting stock and more than half of the investment, in the face of the fact that the parties appear to have agreed when all was serene that in case of a deadlock in counsels a third voice should be heard to break the tie.

All that I now determine is that I see no occasion on the present showing and at this preliminary stage for this court to undertake the operation of the newspapers in question. I am not persuaded at the present juncture that the subject matter in dispute is in danger of such loss or depreciation in value, or that such an emergency exists, as to call for conservation orders.

The rules will be discharged.