ROBERT DROB, HARRY DROB and BENJAMIN DROB, Administrators of Morris Drob, deceased,

*vs.*

NATIONAL MEMORIAL PARK, INC., a corporation of the State OF DELAWARE, and ROBERT MARLOWE, also or formerly known as ROBERT FINEBERG.

ROBERT DROB, HARRY DROB and BENJAMIN DROB, Administrators of Morris Drob, deceased,

vs.

NATIONAL MEMORIAL PARK, INC., a corporation of the State of Delaware, ROBERT F. MARLOWE, FAY MARLOWE, NORMAN MARLOWE, HARRY A. ALTMAN, JOHN J. MULLAHY, FRANK W. WORTH, MARIE K. MILBURN and MARGARET M. RICKER.

*New Castle, March 13, 1945.*

*Aaron Finger,* of the firm of Richards, Layton & Finger, for complainants and petitioners.

*James R. Morford,* of the firm of Marvel & Morford, for defendants in both proceedings.

HARRINGTON, Chancellor: The complainants in the bill and the petitioners under *Section* 31 of the *General Corporation Law, Rev.Code* 1935, § 2063, are the administrators of the estate of Morris Drob, who died intestate January 21st, 1942. In one proceeding they seek the appointment of a receiver for National Memorial Park, Inc., a solvent going

corporation, in order to wind up its affairs, if necessary. In the other, they seek to review and have this court determine the validity of the alleged election of directors of the defendant corporation at the purported stockholders' meeting held December 5th, 1942, but no other relief is sought.

The bill was filed November 27, 1942 and the petition February 24, 1943.

In September of 1933, Robert Fineberg, now known as Robert F. Marlowe, organized National Memorial Park, Inc., and transferred to it two contracts for the purchase of certain real estate in the State of Virginia, near the City of Washington. The consideration for the transfer was the issuance to Marlowe of all the authorized capital stock of the corporation, which consisted of 100 shares of stock without par value. The corporation was organized to operate a memorial cemetery, without tombstones. At first, lots were sold only in blocks for investment purposes; later, they were sold only for burial purposes. Under the plan adopted, a part of the proceeds from all sales was retained for the upkeep and improvement of the cemetery. In order to help finance the project, Marlowe sold 50 shares of his stock to Morris Drob for $15,000, and by agreement that fund was paid into the corporate treasury. By mutual consent, new officers and directors of the corporation were elected at a stockholders' meeting held June 11th, 1934, and the minutes of that meeting, attended by both Marlowe and Drob, contained the following statement:

"Mr. Fineberg stated of record that he had sold a one-half interest in his stock holdings to Morris Drob, but that the same had not been transferred on the books of the corporation by reason of the fact that all of the officers having resigned there were none to accept the transfers and to issue new stock. He also stated that after the present meeting he proposed issuing one share of stock to Constance Marlowe. Mr. Drob stated that after the meeting he proposed issuing one share of stock to Harry A. Altman and one share to John J. Mullahy."

The stock transfers were made accordingly, and the corporate records thereafter showed the following regis-

tered owners: Robert Fineberg, 49 shares; Constance Marlowe, 1 share; Morris Drob, 48 shares, Harry A. Altman, 1 share, and John J. Mullahy, 1 share.

At the June 11th meeting, Marlowe (Fineberg) and his nominee and two nominees of Drob were elected directors .of the corporation. On the day following, a directors' meeting was held, at which Marlowe was appointed the general manager at an annual salary of $10,000. He was to have "complete charge, subject to the supervision of the officers and directors of the affairs of the corporation." A resolution was also passed directing the corporation to "employ Morris Drob in an advisory capacity to assist the General Manager and Comptroller at a salary of Five Thousand Dollars ($5,000.00) per annum." Both accepted the employment but Drob, who was a public accountant, was to devote only a part of his time to the affairs of the corporation. Marlowe's salary was subsequently increased to $225.00 per week, and Drob's increased, by the same amount, to $125.00 per week. Some time subsequent to 1934 differences arose between Marlowe and Drob which became acute by 1938. On April 23rd, 1936, the directors unanimously passed a resolution, directing that Robert Marlowe be paid $3500 for past services. It, however, contained the significant statement that all advances to that date were to be credited on that amount. On the same date, a resolution was passed, directing the payment of $3500 to Harry A. Altman, treasurer of the corporation, as compensation for past services; and that sum was paid in instalments of $500 each. Altman paid the entire amount to Drob, though it seems that he received certain benefits therefrom, the nature of which will be considered later. The corporate records indicate that on or about February 28th, 1936, Drob and Marlowe each lent the corporation $7500. This seems to have some relation to the purchase price of the 50 shares of stock sold by Marlowe to Drob in 1934. For some unexplained reason, the books which were under the general supervision of Drob at first

showed a credit to Drob & Company for the whole amount.

The corporation has never paid any dividends on its capital stock, but the records show that Marlowe had withdrawn, from time to time, $6,735.64 and that Drob had likewise withdrawn $5,855.50.

During the year 1938 Drob accused Marlowe of making secret profits on the sale of lots, of benefiting relatives in various ways at the corporation's expense, and of using devices to enable him to acquire Drob's stock in the corporation at Marlowe's own figure. At a directors' meeting held June 11th, 1938, which was attended only by Marlowe, his son and Drob, an attempt was made to terminate Drob's employment. At a meeting held June 25th, 1938, attended by the four directors, Drob undertook to terminate the employment of both Marlowe and his son, claiming that they were disqualified by interest from voting on the motion. The controversy was bitter, and perhaps Drob's charges can be summed up by a letter to Marlowe dated November 14th, 1938, in which he said:

"You have used every trick imaginable to deprive me of my rights in this Company. You have systematically planned and persistently endeavored to discourage me to enable you to acquire my holdings in the corporation at your price."

Finally on July 29th, 1939, a stockholders' meeting was held at which the corporate by-laws were materially amended. The minutes state:

"The Stockholders being informed by legal opinion that certain changes were necessary and desirable in the By-Laws of the Corporation, thereupon considered changes in the By-Laws. On motion duly made, seconded and unanimously adopted, Paragraph II of Chapter V of the By-Laws was amended to read as follows:

* * * * * *

"3. Six (6) persons shall constitute the Board of Directors.

"4. An attendance of five (5) of the directors shall be necessary to constitute a quorum for the transaction of business.

"5. An affirmative vote of five (5) of the six (6) directors shall

be necessary for the Board of Directors to take any action on any subject.

\* \* \* \* \* \*

"On motion duly made, seconded and unanimously passed, Chapter XXII was amended to read as follows:

" 'These By-Laws may be amended at any regular or special meeting of the stockholders by holders of a majority of the outstanding stock.' "

The amendment, therefore, provided (1) for six directors, and required the attendance of five for a quorum; (2) for the affirmative vote of five of the six directors to take "any action on any subject"; and (3) that future amendments to the by-laws could only be made on the vote of a majority of the holders of the outstanding stock.

It seems that Drob and Marlowe were still unable to agree. On January 15, 1940 Marlowe obtained from Drob an option to purchase 50 shares of the corporate stock "which you (Drob) own or control" for $75,000; but that option was not exercised. Negotiations for a sale of Drob's stock to Marlowe had been going on since 1937 but to no purpose. At a directors' meeting held February 28, 1942, the minutes purport to show that Frank W. Worth who had been elected vice-president of the corporation at the stockholders' meeting on July 29, 1939 and Fay Marlowe, wife of Robert F. Marlowe were elected directors to fill the vacancies caused by the deaths of Morris Drob and Dr. Hancher. No by-law authorizing that action was produced. The board then purported to pass a resolution authorizing and directing Worth to assume the duties of president of the corporation pending the election of a president to succeed Dr. Hancher. On September 28, 1942 the alleged new corporate board adopted a resolution authorizing the payment of an over-writing commission of 5% to Marlowe on all future business done by the corporation. No annual stockholders' meeting had been held, however, since July 29, 1939 at which Robert F. Marlowe, Norman Marlowe, John W. Hancher,

Morris Drob, Harry A. Altman and John J. Mullahy were elected directors of the corporation. Only four of these or less than a quorum were living on September 28, 1942. Drob died January 21st, 1942 and Dr. Hancher died in February of the same year. Harry Drob, a brother of Morris Drob and one of his administrators testified that as between them he was the real owner of one-half of Morris Drob's stock in National Memorial Park, Inc., and by agreement with him was to receive one-half of the weekly amounts paid during his lifetime. After the latter's death Marlowe was told of Harry Drob's interest, and was requested to continue to pay him temporarily one-half of the prior weekly payments. There is testimony to the effect that Marlowe consented to this. When the first check for $50 was sent, it was accompanied by a note for a like amount, payable to the corporation, to be signed by Harry Drob. He declined to treat the payment as a loan, so no payments were ever made to him. It is not claimed that Harry Drob ever performed any services for the corporation. Since Drob's death Marlowe has offered to pay $10,000 for his stock though $15,000 was paid for it in 1934 and the cemetery has since been developed and about 45% of the lots have been sold.

Some time shortly after Morris Drob's death, one of his administrators took a possible purchaser of his stock in the corporation to see the cemetery. They had not notified Marlowe of their intended visit, but on their arrival he happened to be at the gate. When the administrator told him the purpose of their visit, he offered to drive them around the property. There is evidence that Marlowe told them that there had not been many burials in the cemetery and that it looked like a losing proposition. He also told them that government inspectors had been examining the corporate books in connection with possible tax liabilities. In fact, there was some subsequent litigation in which a tax judgment was entered against the corporation by the trial court but an appeal is pending.

They could get no information from Marlowe with respect to the condition of the corporation and Drob's administrator finally charged him with attempting to discourage a sale of the stock. Marlowe denies any such purpose and says that he was merely being frank. At the argument he admitted that the corporate prospects were excellent but did not even claim that he had given any such favorable information to the possible purchaser of the stock. On or about July 1st, 1942, the complainants through their solicitors proposed to Marlowe's solicitor that they name a figure at which they would be willing to purchase Drob's stock with the understanding that before such figure was named Marlowe should agree that he would either sell his stock at the price named or buy the stock of the Drob estate at $5,000 below the figure named; Marlowe to have the option whether to sell at the higher figure or to buy at the lower figure. The proposition was rejected.

The certificates for the shares of stock registered in the respective names of Altman and Mullahy, assigned in blank by them, were in Drob's possession at his death. The assignments were undated, but were witnessed by Sadie Fine, an office employee of Drob, now employed by Altman and Mullahy, some time after July 14, 1935, the date of her marriage; prior thereto she was Sadie Goldberg. But she does not recall the precise date of the assignments or know why they were made. Altman and Mullahy had been in Drob's office, as employees or otherwise, for a number of years prior to his death. They claim that Drob gave each of them a share of stock in 1934, in recognition of long and valuable services, for which they had not been adequately compensated; that additional compensation had often been discussed and promised, but never paid, and that Drob thought these shares might be valuable some day. Drob caused Altman and Mullahy to be elected directors of the corporation, and Altman seems to admit that during his lifetime both as stockholders and directors, they voted as he voted. They certainly voted with Drob when he attempted

to terminate the employment of both Marlowe and his son in 1938: So the complainants claim that the shares issued to Altman and Mullahy on June 12th, 1934 were merely intended to qualify them to be directors of the corporation. They deny this and claim that they are the real owners of the shares. They say that the certificates were not assigned by them until late in 1939, or early in 1940, when negotiations were pending for the sale of 50 shares of the corporate stock by Drob to Marlowe and in order to facilitate the contemplated sale. The two certificates had been in Drob's possession since the latter part of 1937, but there is no direct evidence that they had then been assigned by the record owners. In October of 1937, Drob had a nervous breakdown, and was at Atlantic City and elsewhere for at least six months. He was having financial difficulties and before he left handed all his securities, including the certificates for the two shares of stock in controversy, to his attorney in order to enable him to dispose of them during his absence if expedient or necessary. Altman and Mullahy concede this, but claim that because of their long association with Drob they were willing to help him if necessary. In February or March of 1937, or almost three years after the certificates had been issued to Altman and Mullahy, there apparently was some discussion at a board meeting attended by Drob with respect to whether the laws of Delaware required directors of corporations organized here to be stockholders. The secretary was directed to write the Attorney General of Delaware for information on that question and was informed that a director was not required to be a stockholder. Drob was shown the original or a copy of that letter. Marlowe probably initiated the inquiry of the Attorney General as he wished to recover some qualifying shares assigned by him.

The complainants did not know until about ten months after Drob's death that Altman and Mullahy claimed to be the real owners of the shares, standing in their names, or that they were supporting Marlowe's policies. In November

of 1942, they each wrote the complainants demanding that the certificates for these shares be delivered to them; this was refused and the bill was filed a few days later. Both Harry Drob and an attorney representing the complainants had repeatedly talked to Altman and Mullahy about Drob's affairs, and particularly about his interest in National Memorial Park, Inc., but they never intimated that they were the real owners of the two shares, the certificates for which had been assigned and delivered to Drob.

Harry Drob, one of the administrators, testified that after Morris Drob's death, Altman told him that "he had no interest in National Memorial Park, Inc. and would like to resign" as treasurer; that tax questions were being raised by the Government and as he was the treasurer he might be the one to get in trouble. Harry Drob further testified that substantially the same statements were made to him by Altman on various occasions both before and after Morris Drob's death. In some of those conversations the controversies between Drob and Marlowe were also emphasized as a reason for Altman's desire to resign as treasurer; but it seems that he also said that he and Mullahy would look after the interests of the Drob family. In February of 1942, there was a conference at Drob's office in Philadelphia between one of his administrators, their attorneys and Marlowe, at which the sale of Drob's stock to Marlowe was discussed. Altman knew the purpose of the conference and was in and out of the office from time to time, but never intimated that he had any real rights in any part of the 50 shares which the complainants sought to sell. There was some discussion at that meeting regarding some notes and mortgages alleged to be held by the Drob estate against Marlowe. Altman admits that during the conference he heard the following statement made to Marlowe:

"You don't have to worry about these notes or those mortgages if we effect the sale." Altman also testified

that Drob told him that he was to have a 10% interest in his stock in National Memorial Park, Inc. for acting as treasurer of the corporation, and indirectly and by a credit on a fur coat sold him by a client of Drob he received 10% of the $3500 corporate payment which he turned over to Drob; and that he also received 10% of a corporate payment of $175.00 to Drob in January of 1942. He says that the latter payment was the only direct cash withdrawal from the corporation by Drob in addition to his salary.

The testimony of Mullahy with respect to the ownership of the 2 shares of stock did not materially differ from that of Altman. Both also claim that they were partners of Drob after October, 1937, and as such were entitled to interests in the National Memorial Park, Inc. stock. A partnership agreement seems to have been drawn and signed, but the evidence indicates that it was never acted on. In their subsequent income tax returns Altman and Mullahy accounted for salaries and for nothing more; the entries in Drob's books also indicate that they were mere employees and were receiving salaries as such. The shares of stock issued by the defendant corporation were not listed on the stock exchange. Other by-laws provide:

Chapter 2, Section 3:

"3. Each stockholder shall be entitled to one vote for each share of stock registered in his or her name on the books of the corporation.

"4. The annual meeting of the stockholders shall be held on the first Tuesday in January of each year at eleven o'clock in the forenoon when they shall elect by ballot a board of directors.

"5. Written notice of the annual meeting shall be mailed to each stockholder at his post office address as the same appears on the stock ledger of the corporation at least ten days prior to the meeting.

"6. Special meetings of the stockholders may be called by the president or by the owner or owners of the majority of the stock of this corporation on ten days' notice mailed to all the stockholders, and such notice shall state briefly the object of such meeting."

Chapter 4:

"4. The corporation shall treat the registered holder of stock as the absolute owner thereof and shall not recognize any equity or claim to or interest in such shares on the part of any other person."

Chapter 8:

"1. The officers of the corporation shall consist of a president, vice-president, secretary and treasurer and such other officers as may from time to time be appointed by the board of directors."

Chapter 10:

"The vice-president shall be vested with all the powers and shall perform all the duties of the president in the absence or disability of the latter unless or until the directors shall otherwise determine. He shall have such other powers and perform such other duties as shall be prescribed by the directors."

At a purported directors' meeting held November 13th, 1942, attended by the four surviving directors who had been elected in 1939 and by Worth, who is alleged to have been elected a director by the board in February of 1942, the secretary was directed by resolution to send out notices calling a stockholders' meeting to be held at the usual place on December 5th, 1942; that direction was complied with and the complainants were given more than ten days' written notice. Their representatives appeared at the time and place named in the notice with a proxy. Pursuant to its express direction they protested against holding the meeting claiming that it was not legally called; but the protest was disregarded and a purported meeting was held. Two tickets were nominated, one by Marlowe and one by the persons holding a proxy from Drob's administrators. Altman and Mullahy were present and voted the stock standing in their names for the Marlowe ticket. Their votes were cast over the protest of the representatives of the complainants who then had in their possession the two certificates of stock, assigned in blank, and claimed to be the beneficial owners of the shares represented thereby. By proxy the administrators also cast their ballot for 50 shares of stock in favor

of the Drob ticket, though only 48 shares stood in their names on the corporate records. The chairman of the meeting declared that the Marlowe ticket had received 52 votes and the Drob ticket 48 votes, and that the former was elected accordingly.

The commissions taken by Marlowe pursuant to the purported action of the board on September 28, 1942 were not legally authorized and a decree for an accounting would be justified. Worth was not legally elected a member of the board in February of 1942 and there were only four real members when the September meeting was held. Neither the by-laws nor *Section* 30 of the *General Corporation Law, Rev. Code* 1935, § 2062, authorized less than five members of the board to fill vacancies therein. *Section* 30 permits the "remaining directors" to fill vacancies "unless it is otherwise provided in the Certificate of Incorporation or the by-laws." The exception in the statute is controlling as the by-laws passed by the vote of the Drob and Marlowe factions require the affirmative vote of five directors for action "on any subject." In view of the broad language used it is difficult to restrict its meaning to corporate business matters, including salaries.

This is particularly true in view of the more limited phraseology of the by-law passed at the same time requiring a quorum of five for the transaction of "business." *In re Chelsea Exchange Corporation,* 18 *Del. Ch.* 287, 159 *A.* 432, is not inconsistent with this conclusion. But the complainants claim that an accounting will not adequately protect their rights and that a receiver should be appointed to wind up the affairs of the corporation if necessary. Pursuant to the allegations of the bill they claim that the evidence shows (1) that the capital stock of National Memorial Park, Inc. is owned in equal shares by Drob's estate and by Marlowe and because of serious disagreements between them and the provisions of the corporate by-laws there has been a complete deadlock paralyzing all corporate action

since early in 1942; (2) that Marlowe has in effect operated the corporation since that time, largely for his own benefit; and because of the disagreements between the sole stockholders, it would be useless to call a meeting to elect directors; (3) that Marlowe is unwilling to purchase Drob's 50 shares of stock except at a price far below its value and under the circumstances the complainants are unable to sell it to anyone else; (4) that even if the Drob estate owns only 48 of the 100 no par shares issued, the corporate organization was regarded and operated by the two stockholders as if it were a mere commercial partnership of two members, the understanding being that any withdrawals above $200 a week to Marlowe and $100 a week to Drob were to be equal. They also claim that it is unfair and inequitable for Marlowe to exclude the Drob estate from any corporate benefits whatever, while at the same time taking commissions on sales and other emoluments; and that is particularly true because of Harry Drob's interest in Morris Drob's stock. The complainants' theory is that an unfair and inequitable situation exists which if continued will necessarily cause a considerable loss to Morris Drob's estate, and that Marlowe's refusal to remedy it by agreeing to a sale of the corporate assets or otherwise, amounts to fraudulent conduct. Summarizing their contentions they say that "it is no longer possible for this corporation to function as the parties unanimously agreed that it should * * * to-wit: upon an organization basis which requires the participation and approval of the Drob estate"; that Marlowe has "in effect seized the corporation, has excluded Drob's estate from participation therein, and is operating the corporation contrary to his commitment, contrary to the by-laws * * * and contrary to the statute."

The defendants claim that as the corporation is a prosperous solvent going concern, a receiver should not be appointed; and that the complainants merely seek by that method to compel Marlowe to purchase their stock.

The complainants must prove the allegations of their bill, but the evidence supports their claim that Morris Drob at the time of his death was the real beneficial owner of the two shares in controversy. Neither Drob nor his administrator ever had the certificates for these shares recorded in their names on the corporate records, but the presumption of ownership from their possession assigned in blank is not overcome by the defendants' evidence. There is no written memorandum supporting the claims of the record holders, and nothing to indicate any demands on Morris Drob during his lifetime for the return of the assigned certificates. The demand on the complainants, his administrators, was not made until months after his death. Other evidence in the record including some admissions against interest also tends to support the complainants' claims on behalf of Drob's estate.

In recent years courts of equity have often recognized their inherent right to wind up the affairs of a solvent going corporation and to appoint a receiver for that purpose for the protection of minority stockholders when fraud and gross mismanagement by corporate officers, causing real imminent danger of great loss, clearly appears, and cannot be otherwise prevented. See *The Lichens Co. v. Standard Commercial Tobacco Co., ante p.* 220, 40 *A.* 2d 447; *Thoroughgood v. Georgetown Water Co.,* 9 *Del. Ch.* 84, 82 *A.* 720; *Securities & Exchange Comm. v. Fiscal Fund,* (*D.C.*) 48 *F. Supp.* 712; *Maxwell v. Enterprise Wall Paper Mfg. Co.,* (3 *Cir.*) 131 *F.* 2d 400; *Brent v. B. E. Brister Sawmill Co.,* 103 *Miss.* 876, 60 *So.* 1018, 43 *L. R. A.* (*N.S.*) 720, *Ann. Cas.* 1915*B,* 576; 40 *Col. Law Review* 220. But a receiver will never be appointed except under special circumstances of great exigency and when some real beneficial purpose will be served thereby. *Lichens Co. v. Standard Commercial Tobacco Co., supra; Salmita Corporation v. Walter Holding Corporation,* 19 *Del. Ch.* 426, 168 *A.* 74. Moreover a receiver is merely a remedy of an auxiliary and incidental nature and cannot be the sole object of the bill (*Lichens Co. v.*

*Standard Commercial Tobacco Co., supra; Lewis v. Commonwealth Securities, Inc., (D.C.)* 51 *F. Supp.* 33; *Securities & Exchange Comm. v. Fiscal Fund, supra*) ; and in most cases some other primary relief against alleged fraudulent or inequitable conduct by a defendant in breach of fiduciary obligations is also specifically prayed for. 40 *Col. Law Review* 233; *Securities & Exchange Comm. v. Fiscal Fund, supra; Myers v. Occidental Oil Corporation, (D.C.)* 288 *F.* 997.

Mere dissensions among corporate s t o c k h o l d e r s, whether over internal matters or otherwise, will seldom justify the appointment of a receiver. *Salnita Corporation v. Walter Holding Corporation,* 19 *Del. Ch.* 426, 168 *A.* 74; 16 *Fletch. Cyclo. Corps., p.* 124. Contract rights are involved and in most cases, in the absence of fraud or of gross mismanagement causing conditions of great exigency, the only remedy of the dissatisfied stockholder is to sell his stock for what it will bring. Marlowe was not bound to purchase Drob's stock, or to sell his own, and it was not fraud for him to refuse to enter into the purchase or sale agreement proposed by the complainants. Nor was it inequitable for him to refuse to continue any part of the monthly payments that had been made to Morris Drob as an employee during his lifetime, though Marlowe's salary as general manager was still being paid. There is evidence that on one occasion Marlowe made statements to a third person, that might be construed as being intended to discourage the latter's purchase of Drob's stock. He seems to have emphasized the corporate disadvantages and to have said nothing good about its financial prospects which he now says are excellent; but these facts do not justify the appointment of a receiver on the ground of fraudulent and inequitable conduct endangering the corporate assets.

The complainants also point out that *Section 9* of the *General Corporation Law, Rev. Code* 1935, § 2041, provides:

"The business of every corporation organized under the provisions

of this Chapter shall be managed by a Board of Directors, except as hereinafter or in its Certificate of Incorporation otherwise provided."

They claim that since the deaths of Drob and Hancher early in 1942, this provision has been entirely disregarded and that Marlowe and his associates have operated the corporation without a functioning board. It is said that serious and long continued deadlocks in both the governing board and among two equal owners and holders of the stock of a solvent corporation, resulting in a complete paralysis of any real corporate action, necessarily cause such imminent danger of loss, without further proof, as to justify the appointment of a receiver with power to wind up its affairs. See *Bowen v. Bowen-Romer Flour Mills Corporation,* 114 *Kan.* 95, 217 *P.* 301, 43 *A. L. R.* 238; 16 *Fletch. Cyclo. Corps., pp.* 129, 130; 40 *Col. Law Rev.* 220, 230; 43 *A. L. R.* 268. The alleged similarity of corporations, having only a few stockholders, to partnerships and the rules applied when there are serious dissensions among partners, causing deadlocks may have some bearing on that contention. See *In re Davis and Collett, Ltd. L.R.* (1935) 1 *Ch.* 693. But in any event dissensions resulting in a deadlock among either the directors or between small groups holding equal amounts of stock making it impossible for the time being to carry on the corporate business to the advantage of the interested parties may justify the appointment of a temporary receiver to preserve the corporate assets until it can function properly. 16 *Fletch. Cyclo. Corps., (Per. Ed.)* 127, 128, 130; *Sternberg v. Wolff,* 56 *N. J. Eq.* 389, 39 *A.* 397, 39 *L. R. A.* 762, 67 *Am. St. Rep.* 494; *Elevator Supplies Co. v. Wylde,* 106 *N. J. Eq.* 163, 150 *A.* 347; *Featherstone v. Cooke, L.R.* 16 *Eq.* 298; *Trade Auxiliary Co. v. Vickers, L.R.* 16 *Eq.* 303.

But if a full corporate board were legally elected at the alleged stockholders' meeting of December 5, 1942, even a temporary receiver will not be appointed. There can then be no paralysis of corporate action and no imminent danger of loss resulting therefrom; that is a material fact

in determining the complainants' rights under their bill. See *Johnston v. Jones*, 23 *N. J. Eq.* 216; *Freeman v. Hare & Chase, Inc.*, 16 *Del. Ch.* 207, 142 *A.* 793. The by-laws provide for meetings for the election of directors in January of each year. *Section* 31 of the *General Corporation Law* also provides that if an election is not held on the day designated by the by-laws "the directors shall cause the election to be held as soon thereafter as conveniently may be." The reasonable inference is that the action directing the required notice calling a meeting must be taken by the directors sitting as a board. *Johnston v. Jones, supra.* By action taken at an alleged directors' meeting held November 13, 1942, the secretary was directed to send out written notices calling the meeting of December 5th; and the complainants admit that they received such a notice. The four surviving members of the board who were elected in 1939 and Worth attended that meeting and voted to call the stockholders' meeting.

Worth was not a legally elected director but had acted as such under color of right at various directors' meetings since the action of the board purporting to elect him in February of 1942 and must therefore be regarded as a *de facto* officer. *McWhirter, et al., v. Washington Royalties Co.*, 17 *Del. Ch.* 243, 152 *A.* 220; *Moon v. Moon Motor Car Co.*, 17 *Del. Ch.* 176, 151 *A.* 298. As a general rule the actions of *de facto* officers are only binding on the corporation so far as third persons are concerned. (2) *Fletch. Cyclo. Corps., p.* 144); but a more liberal rule has been applied when notices are given by such officers calling a stockholders' meeting if they would have had that right as *de jure* officers. *Moon v. Moon Motor Car Co., supra.* That principle is applicable to this case and the call of the December stockholders' meeting was valid as to the complainants.

The Marlowe ticket of six directors was elected at that meeting by a declared majority of four votes only two of which can even be questioned; and no reason appears for

placing the corporate assets in the custody of a receiver of any kind. The fifty shares of stock registered in the name of Marlowe were voted by him for his ticket while the forty-eight shares registered in the names of the complainants as administrators were voted for the opposing and losing ticket; the Marlowe ticket was therefore elected by a majority of at least two votes. The complainants also sought to vote the two shares of stock standing in the names of Altman and Mullahy for their ticket but the tendered votes were properly rejected and there was not a tie vote; only record holders can vote shares at stockholders' meetings. *In re Giant Portland Cement Co.*, 26 *Del. Ch.* 32, 21 *A.* 2d 697; *McLain, et al., v. Lanova Corporation, ante p.* 176, 39 *A.* 2d 209.

Altman and Mullahy also voted the shares standing in their names for the Marlowe ticket. The right to vote shares of stock having voting powers is ordinarily an incident of its legal ownership. *In re Giant Portland Cement Co., supra; McLain, et al., v. Lanova Corporation, supra.* The complainants claim, however, that as they were the real owners and holders of the certificates, it was inequitable for the complainants to vote the shares over their express objection. See *In re Canal Construction Co.*, 21 *Del. Ch.* 155, 182 *A.* 545; *Italo Petroleum v. Producers Oil Corp.*, 20 *Del. Ch.* 283, 174 *A.* 276; *In re Giant Portland Cement Co., supra.* It is doubtful whether the cases cited support that contention, but it is unnecessary to consider that question. See *McLain, et al., v. Lanova Corporation, supra,* and cases cited.

Marlowe must account for all commissions received on sales after the alleged resolution of the directors in September of 1942 but a receiver will not be appointed. A decree will be entered in accordance with this opinion.

The petition under *Section* 31 of the *General Corporation Law* seeks no real relief, and a decree dismissing it will be entered.