[No. 28230.  Department Two.  May 26, 1941.]

J. L. COOPER & COMPANY, *Appellant*, v. ANCHOR SECU-
RITIES COMPANY *et al.*, *Respondents.*[1]

[1]Reported in 113 P. (2d) 845.

46

*R. E. Lowe,* for appellant.

*Cannon, McKevitt & Fraser,* for respondents Anchor Securities Company *et al.*

*Richard S. Munter,* for respondent T. J. Corkery.

MILLARD, J.—June 21, 1937, J. L. Cooper & Company, a corporation, engaged in real estate and insurance business in Spokane, purchased the business and good will of T. J. Corkery Company, a corporation, which was operating an agency in Spokane for the writing of general lines of insurance. On the date of that sale, T. J. Corkery, owner and manager of Corkery Company, was employed in the insurance department of Cooper & Company in which employment he continued until May 10, 1939, when he became manager of the insurance department, the trade name of which is the H. S. Gimble Insurance Agency, of Anchor Securities Company.

An action was brought by J. L. Cooper & Company to restrain T. J. Corkery, the Anchor Securities Company, and H. S. Gimble, who is doing business as the Gimble Insurance Agency, which is an insurance department of the Anchor Securities Company, from soliciting the renewal of insurance policies by persons who at some previous time purchased insurance through T. J. Corkery Company or T. J. Corkery; and to also restrain the defendants from soliciting any customers of plaintiff through information secured from expiration lists or other data obtained by T. J. Corkery while a confidential employee of plaintiff. The further prayer of plaintiff is that defendants be required to account for all business and moneys they may have received by reason of the wrongful solicitation of customers of the plaintiff.

The Anchor Securities Company and H. S. Gimble denied they had knowledge, May 10, 1939, when they employed Corkery, that plaintiff had previously purchased the good will of T. J. Corkery and of T. J. Corkery Company. They also denied that Corkery, at their instance, solicited insurance business from former customers of T. J. Corkery and T. J. Corkery

Company; however, they admitted that Corkery will continue to solicit insurance business from persons who prior to May 10, 1939, purchased insurance from T. J. Corkery and T. J. Corkery Company. They further alleged that Corkery entered the employ of the Securities Company without any solicitation or knowledge on their part of the relationship previously existing between plaintiff and Corkery.

T. J. Corkery admitted that, since his employment in the insurance department of the Anchor Securities Company, he has solicited insurance business from persons who prior to May 10, 1939, purchased insurance from T. J. Corkery or T. J. Corkery Company. By cross-complaint Corkery sought recovery of the balance of one-half of the net earnings of plaintiff's insurance department claimed to be due under an agreement obligating plaintiff to pay to him from the earnings of its insurance department two hundred and fifty dollars monthly as salary and one-half of the net earnings of the insurance department. As an affirmative defense Corkery pleaded that plaintiff "did not come into this court of equity with clean hands" because plaintiff had breached its agreement with Corkery, under which the former was obligated to pay to the latter a salary of two hundred and fifty dollars monthly plus one-half of the net profit of plaintiff's insurance department.

Trial of the cause to the court resulted in findings of fact, summarized as follows:

T. J. Corkery sold to T. J. Corkery Company, a corporation, January 1, 1933, the insurance business and good will of an insurance agency theretofore operated and solely owned by Corkery, who immediately upon such sale entered into the employ of T. J. Corkery Company, in which employment he continued until employed by plaintiff on June 21, 1937, at which time

plaintiff purchased from various insurance companies, the then owners thereof, practically all the assets of the insolvent T. J. Corkery Company, including the good will of the business of Corkery Company. As part of the same transaction, plaintiff entered into a contract to place Corkery in charge of its insurance department, Corkery's compensation to be two hundred and fifty dollars monthly, plus one-half of the net earnings of plaintiff's insurance department to be computed and paid to Corkery at the end of each calendar year. The contract of employment was terminable by either party thereto at any time.

In April, 1939, after repeated requests by Corkery therefor, plaintiff rendered a statement purporting to show the net earnings of plaintiff's insurance department from July 1, 1937, to December 31, 1938. The statement disclosed the net earnings to be less than the true net earnings, which difference was due to the fact that, contrary to the terms of the employment agreement, plaintiff had treated the salary of two hundred and fifty dollars monthly paid to Corkery as merely a drawing account in that amount chargeable to the one-half of the net earnings of the insurance department payable under the employment agreement. Plaintiff refused, after demand made therefor, to pay Corkery the compensation he claimed was due to him under the terms of the employment agreement, by reason of which breach Corkery declared the contract terminated May 10, 1939, and entered the employment of the insurance department of Anchor Securities Company. All times since he had been in that employment, and upon the advice of legal counsel first had that he had a right to do so, Corkery has solicited insurance business from persons who, at one time or another prior to May 10, 1939, purchased insurance from T. J. Corkery or from the T. J. Corkery Company.

Corkery has not solicited insurance business from any persons who were customers or clients of plaintiff's insurance department prior to May 10, 1939. The employment of Corkery by the insurance department of Anchor Securities Company was entered into and carried out by all the parties thereto in good faith.

The court further found that, about the time when Corkery entered the employment of the Securities Company, the latter had information as to the former employment of Corkery by plaintiff sufficient to put the Securities Company upon inquiry as to limitations upon the activities of Corkery in the insurance business imposed by the transfer of the good will of T. J. Corkery to T. J. Corkery Company. In negotiations between Corkery and Anchor Securities Company in the matter of employment of the former by the latter, the Securities Company's inquiry of Corkery whether he was encumbered in any way by reason of his former connection with plaintiff was answered in the negative.

The trial court concluded that it would be inequitable for plaintiff to maintain the action set forth in its complaint and that same should be dismissed with prejudice, and that T. J. Corkery is entitled to recovery, on his cross-complaint, of the balance of compensation due him on his employment contract with plaintiff in the amount of $2,571.66. Judgment was entered accordingly. Plaintiff appealed.

Counsel for appellant first contends that the weight of the evidence is against the finding that Corkery was to receive a salary plus one-half of the profits from the insurance business.

T. J. Corkery was engaged from 1917 in the insurance business in Spokane as a solicitor for other agencies until 1931, when he established his own insurance agency. January 1, 1933, Corkery and another party, who does not appear in this controversy,

incorporated the T. J. Corkery Company, which commenced business January 1, 1933. Corkery transferred, for some of the capital stock of that corporation, the business and good will of his insurance agency to T. J. Corkery Company, which operated under the management of T. J. Corkery until its assets and good will were sold to appellant in 1937. At that time the Corkery Company, as well as T. J. Corkery, was hopelessly insolvent. It assigned practically all of its assets to certain insurance companies which were creditors of Corkery Company. Those assignees sold the assets and good will of Corkery Company to appellant for four thousand dollars, plus $1,544.16 for accounts payable. At the time of the sale of the business and good will of Corkery Company to appellant, T. J. Corkery was the sole owner of Corkery Company, the business of which, at the time of its sale to appellant, on the basis of renewal premiums, was worth, according to some of the testimony, fifteen thousand dollars.

There is competent evidence, which the trial court accepted as true, that appellant, through one of its officers, and respondent Corkery entered into an oral agreement under which, upon completion of the purchase of the business of T. J. Corkery Company, Corkery was to take charge of and operate the enlarged insurance department of appellant and receive therefor from the earnings of that insurance department a salary of two hundred and fifty dollars monthly and one-half of the net profits of the insurance department. There is nothing in the written agreement covering the sale of the business and good will of the Corkery Company by its assignees to appellant respecting the employment of Corkery by appellant. There is evidence which justifies the failure of Corkery to require an accounting by plaintiff at the end of the calendar years 1937 and 1938.

Counsel for appellant challenges as improbable Corkery's story as to the employment agreement. However improbable may seem the claim of Corkery as to employment in view of his financial position which might cause one to disbelieve that he could drive such a favorable bargain as he claims he drove with appellant, there is evidence which sustains the finding of the trial court on this phase of the case. It is significant that, shortly after termination of his employment with appellant, Corkery was employed by Securities Company under an agreement whereby Corkery received a salary of two hundred and seventy-five dollars monthly, plus twenty per cent of the net profits of the insurance department of the Securities Company. While appellant may have been influenced in employing Corkery by reason of his association with appellant, it should not be forgotten that the long insurance business experience of Corkery in Spokane may have been the determinative factor.

While some items of evidence may raise a doubt as to the story told by Corkery, the findings of fact may not be disturbed, as there is competent evidence, which the trial court accepted as true, which sustains the trial court's findings. The rule is that findings upon conflicting evidence in an equity case will not be disturbed on appeal unless it can be said, and we cannot so say in the case at bar, that the evidence preponderates against them. *Peterson v. Ogle,* 110 Wash. 610, 188 Pac. 768; *Yarnall v. Knickerbocker Co.,* 120 Wash. 205, 206 Pac. 936.

The trial court was of the view that, despite the wrongful breach by appellant of its employment agreement with Corkery, the latter could not solicit directly the customers he and T. J. Corkery Company had prior to the time Corkery became associated with the insurance department of appellant.

"The vendor of good will having the right to conduct a rival business may seek for trade by any honest method, including public advertisement or private advertisement among those who were not customers of the old business, and he may deal with the old customers who, attracted by their knowledge, gained by advertising or otherwise, that he is in business, choose to come and trade with him. However, the vendor will not be permitted to destroy the value of the good will by canvassing directly the old customers, endeavoring to dissuade them from dealing with the purchaser of the good will, and soliciting them to trade with the vendor." 24 Am. Jur. 817.

However, the court denied injunctive relief on the ground that appellant had not come into court with clean hands, inasmuch as it had not paid to Corkery his one-half of the net profits of appellant's insurance business.

The judgment dismissing the action for an injunction is not sustainable upon either of the two grounds urged by respondents: (1) That, in 1939 when Corkery started soliciting his and Corkery Company's former customers, he had the legal right to do so; and (2) that appellant did not come into the court of equity with clean hands.

The "good will" of a business is that value which inheres in the fixed and favorable consideration of customers arising from an established and well conducted business. The sale of the good will of a business carries the implied covenant by the seller that he will not solicit the custom for which the purchaser paid and the seller parted for the consideration he received therefor. Good will is "property" in the legal sense of the term, and subject to sale in connection with the business precisely as other personal property is subject to sale. The purchaser of the good will may assign and sell such good will to a third person even if the transfer from the original owner

does not run to the purchaser, "his successors and assigns," and such third party acquires a full and absolute right to the good will of the business transferred.

In *Stanton v. Zercher,* 101 Wash. 383, 172 Pac. 559, we defined, as follows, "good will" as applied to insurance business:

" 'Good will' has been defined by the courts to be the faith which the manager of a business wins from the public and the probability that old customers will continue their patronage. *Chittenden v. Witbeck,* 50 Mich. 401, 15 N. W. 526; *Williams v. Farrend,* 88 Mich 473, 50 N. W. 446, 14 L. R. A. 161. It comprises these advantages which may inure to the purchaser from holding himself out to the public as succeeding in an enterprise which had been conducted in the past with the name and repute of his predecessor. *Knoedler v. Boussod,* 47 Fed. 465. The good will of the business is not the business but is one result springing out of it. It would be too narrow to construe the word 'business' to be the good will of the business. *McGowan v. Griffin,* 69 Vt. 168, 37 Atl. 298. The good will of the business is a species of personal property, and although inseparable from business, is an appreciable part of the assets of a concern, both in fact and in the estimation of the courts. It is a portion of the subject-matter which produces profits. Story, Partnership, § 99; Lindley, Partnership, 842; *Morgan v. Perhamus,* 36 Ohio St. 517, 38 Am. Rep. 607. That it is property is abundantly settled by authority. *See v. Heppenheimer,* 69 N. J. Eq. 36, 61 Atl. 843."

There is no question of restrictive covenants involved in the case at bar. In the sale January 1, 1933, by T. J. Corkery of his insurance business and good will to T. J. Corkery Company, a corporation of which Corkery was then practically the sole owner, and in the sale June 21, 1937, by T. J. Corkery Company (then solely owned by Corkery), through its assignees, of that same insurance business and good will to appellant, there was not present in either agreement any

covenant by any person restricting the right of any of the parties to those contracts to reengage in a competing business.

Irrespective of appellant's wrongful breach, as found by the trial court, of the employment agreement with Corkery, the latter had the right to seek employment and be employed by the insurance department of the Anchor Securities Company and engage in competition with the insurance department of appellant; but Corkery did not have the right to solicit his old customers or do any act that would interfere with appellant's use and enjoyment of that which it had purchased. Nor did Corkery have the right to carry away confidential information by copies or in his head and solicit names of customers of his former employer thus remembered.

In the absence of express or implied conditions in the contract of sale of a business together with the good will thereof to the contrary, the vendor is at liberty to set up a similar business in the same locality and carry it on in his own name. Annotations 11 Ann. Cas. 573 *et seq.*; 19 L. R. A. (N. S.) 762 *et seq.*; 82 A. L. R. 1030 *et seq.* However, the sale of good will of a business carries with it, even in the absence of a restrictive covenant, the implied obligation that the seller will not solicit his old customers or do any act that would interfere with the vendee's use and enjoyment of that which he had purchased.

"A vendor of the good will of a business will not be permitted to destroy the value of the good will by canvassing directly the old customers of the firm, endeavoring to dissuade them from dealing with the purchaser of the good will, and soliciting them to trade with the vendor at his new stand." 82 A. L. R. 1035.

See, also, 28 C. J. 739-742.

In *Colton v. Duvall*, 254 Mich. 346, 237 N. W. 48, defendant sold to plaintiff his motor truck, local freight

handling business in Monroe, and the good will of the business. He delivered to plaintiff a list of the names of his local customers, below which list he wrote over his own signature, " 'I have sold my business to Kenneth Colton and my good will.' " Defendant engaged for a short time in long-distance freight handling by motor truck then returned to Monroe and engaged in local freight handling business in competition with plaintiff, soliciting customers whose names were on the list delivered by him to plaintiff when he sold the truck, the business, and good will. Plaintiff brought an action to enjoin defendant from engaging in the business of local freight handling in the city of Monroe. From decree in favor of defendant the plaintiff appealed. The supreme court of Michigan in reversing the trial court and holding that plaintiff was entitled to injunction for which he prayed, said:

"Defendant sold the good will of the business—those intangible advantages or incidents which are impersonal and attached to the thing conveyed (*Williams v. Farrand,* 88 Mich. 473 [14 L. R. A. 161]); the favor which the management of the business had won from the public and the probability the old customers would continue their patronage in the future (*Chittenden v. Witbeck,* 50 Mich. 401). Good will is based upon the prospective profits to result from voluntarily continued patronage of the public. It indicates that value which inheres in the fixed and favorable consideration of customers arising from an established and well-conducted business. *Mills v. Rich,* 249 Mich. 489.
.   .   .

"Defendant will not be permitted to derogate from his own assignment. He is not at liberty to destroy what he transferred or depreciate what he sold. There was an implied covenant on the sale of the good will of the business by defendant that he would not solicit the custom which was paid for and parted with. It was a fraud to sell that which he did not mean the purchaser to have; to pocket the paid price and attempt

to recapture the thing sold; or to solicit or attempt to decoy it away from plaintiff, or call it back to himself before plaintiff had time to attract it to himself and make it his own. Defendant cannot impair the value of what he sold or sell the business and its good will, take the price paid, and keep or retake the thing sold. These principles are elementary and have been repeatedly stated by the English and American courts. *Labouchere v. Dawson*, L. R. 13 Eq. 322; *Trego v. Hunt*, L. R. 21 App. Cas. 7; *Suburban Ice Manfg. & Cold Storage Co. v. Mulvihill*, 21 Ohio App. 438 (153 N. E. 204); *Grow v. Seligman*, 47 Mich. 607 (41 Am. Rep. 737).

"Defendant's conduct violates the contract, deprives plaintiff of the good will which he bought and paid for, and should be enjoined. *Thompson v. Andrus*, 73 Mich. 551."

In *Suburban Ice Mfg. & Cold Storage Co. v. Mulvihill*, 21 Ohio App. 438, 153 N. E. 204, it was held that the seller of an ice business including good will would not be permitted to impair the good will by soliciting business of old customers before buyer had time to make them his own. The court said:

"We are of opinion that the rule of law applicable is laid down in the case of *Labouchere v. Dawson*, L. R., 13 Eq., 322. The syllabus in that case follows:

" 'The vendor of a business and the good will thereof may, in the absence of express stipulation to the contrary, set up a business of the same kind either in the same neighborhood or elsewhere, and may publicly advertise the fact of its having done so; but he must not solicit the customers of the old business to cease dealing with the purchaser, or to give their custom to himself.'

"In the case of *Trego v. Hunt*, L. R. App. Cas., (1896), p. 7, the House of Lords of England had the question before it, and in the course of the opinion Lord McNaughton said:

" 'The principle on which *Labouchere v. Dawson* rests has been presented in various ways. A man may not derogate from his own grant; the vendor is not

at liberty to destroy or depreciate the thing which he has sold; there is an implied covenant on the sale of good will, that the vendor does not solicit the custom which he had parted with; it would be a fraud on the contract to do so. These, as it seems to me, are only different turns and glimpses of a proposition which I take to be elementary. It is not right to profess and purport to sell that which you do not mean the purchaser to have; it is not an honest thing to pocket the price and then to recapture the subject of sale, to decoy it away or call it back before the purchaser has had time to attach it to himself and make it his very own.'

"While the authorities in this country are far from uniform on the question, we are of opinion that the great weight of authority will sustain, and is in accord with, the above pronouncement in the case of *Trego v. Hunt*, and it seems to us entirely sound. . . .

"An examination of the record shows there was some evidence tending to show that Mulvihill, in starting his new business, solicited those who were his customers prior to the merger in 1916, and that some of his men called on such customers and sold ice books to them, so that there is evidence tending to show a solicitation. But it will be noted that the sale and merger took place on or about the 1st of March, 1916; that Mulvihill did not go into competition with the Suburban Ice Manufacturing & Cold Storage Company until March, 1919, more than three years later. This evidence is undisputed. The cross-petitioner's evidence establishes the fact. Applying to the present case the rule above referred to, that 'it is not an honest thing to pocket the price and then to recapture the subject of sale, *to decoy it away or call it back before the purchaser has had time to. attach it to himself and make it his very own,*' the undisputed evidence discloses that the Suburban Ice Manufacturing & Cold Storage Company had three years in which to attach the customers to itself, and to make them its very own. The customers would only be customers of the Suburban Ice Manufacturing & Cold Storage Company by virtue of the sale of the good will. Under the facts of this case, three years must be considered

sufficient time in which to attach that good will to itself, and make it its own. After three years of service to the customers, they could no longer be called old customers of the Mulvihill Ice Company, but were customers of the Suburban Ice Manufacturing & Cold Storage Company. To hold otherwise would be unreasonable, in restraint of trade, and contrary to public policy."

In 1905, one Andrew Sundseth, a retail dealer in furniture and undertaking in the city of Minneapolis, sold his business, and the good will to the business, to Haugen & Meier, a copartnership composed of Thomas A. Haugen and John Meier. The firm of Haugen & Meier was dissolved about one year later and the business including all the rights under the above-mentioned contract between Sundseth and Haugen & Meier was sold to a copartnership composed of Tollef K. Haugen and John Meier, under the firm name of Haugen & Meier Company. Thereafter the Sundseth Furniture & Undertaking Company was organized and opened up a furniture and undertaking business in the neighborhood of the old stand occupied by Sundseth prior to the sale to Haugen & Meier. This new concern. was organized by Sundseth using the name of his wife and he controlled and conducted same.

Tollef K. Haugen & John Meier, a copartnership operating under the firm name of Haugen & Meier Company, successors of Haugen & Meier, instituted an action to restrain both Sundseth and the Sundseth Furniture & Undertaking Company from continuing in business in violation of the contract between plaintiffs' predecessors and Sundseth. It is true that in this case Sundseth covenanted with the predecessors of plaintiffs not to enter into the same kind of business in Minneapolis for the term of five years, but the case supports the statement in early part of this

opinion that "good will" of a business is property and subject to sale as other personal property is subject to sale.

A temporary injunction was granted as to Sundseth but denied as to Sundseth Furniture & Undertaking Company. Sundseth appealed. In affirming the judgment and holding that the contract by which Sundseth transferred to plaintiffs' predecessors the good will of the business in question was not intended to confer a mere personal privilege on the purchaser, but was intended to transfer the full and absolute right to the good will of the business transferred, the supreme court of Minnesota said:

"It is insisted by defendant Sundseth that the rights of Haugen & Meier in and to the good will of this business did not pass to the new copartnership, for the reason that it was personal to the old firm so long as they should continue to conduct the business, and was not assignable by them to other persons. We are unable to concur in this view of the question. The good will of a business is the favor won from the public and the probability that old customers will continue their patronage. It is an advantage and benefit that is acquired by business establishments beyond the value of the money or property invested therein, and is property in the legal sense of the term, and subject to sale and transfer in conjunction with a sale of the business, precisely as other personalty. *Bradford v. Montgomery*, 115 Tenn. 610, 92 S. W. 1104, 9 L. R. A. (N. S.) 979; *Williams v. Wilson*, 4 Sandf. Ch. 379; *Musselman's Appeal*, 62 Pa. St. 81, 1 Am. 382; *Hitchcock v. Coker*, 6 Adol. & El. 438; *Pearson v. Pearson*, L. R. 27 Ch. Div. 145; 19 Cent. L. J. 362. In the case at bar the good will was sold by Sundseth to the old firm of Haugen & Meier, and if subject to sale as an article of property and as an incident of the business to which it is attached, it is equally assignable by the purchaser, and the new firm acquired a good title. *Tuttle v. Howe*, 14 Minn. 113 (145), 100 Am. Dec. 205.

"The fact that the contract in question did not run

to Haugen & Meier 'and their successors and assigns' does not affect the question in the least. While perhaps the use of those words or their equivalent may in instances be essential to confer the right of alienation in the grantee, their use is wholly unnecessary in a case like that at bar. . . . In other words, an unconditional sale of specific property to A. passes an indefeasible title and empowers him to sell and transfer to B., whether the original muniment of title ran to A. and his heirs and assigns or not. The rule applies to sales of good will. *Fleckenstein v. Fleckenstein*, 66 N. J. Eq. 252, 53 Atl. 1043; *Swarts v. Narragansett Co.*, 26 R. I. 436, 59 Atl. 111; *Salem Capital Flour Mill Co. v. Stayton Water-Ditch & Canal Co.* (C. C.) 33 Fed. 146; *Sheppard v. Stites*, 7 N. J. L. 90, 91.

"Nor was the good will in the case at bar limited by the contract, properly construed, to the original grantees Haugen & Meier, but, on the contrary, was attached to and an incident to the business transferred and passed to the new firm. *Pease v. Rush*, 2 Minn. 89 (107); *Churton v. Douglas*, Johns. Eng. Ch. 174; *Howe v. Searing*, 10 Abb. Pr. 270; *Hedge v. Lowe*, 47 Iowa 137; *Webster v. Buss*, 61 N. H. 40, 60 Am. 317; *Francisco v. Smith*, 143 N. Y. 488, 38 N. E. 980; *Guerand v. Dandelet*, 32 Md. 561, 3 Am. 164; *Pemberton v. Vaughan*, 10 Q. B. 87; *Elves v. Crofts*, 10 C. B. 241; *Swanson v. Kirby*, 98 Ga. 586, 26 S. E. 71; *Wilmer v. Thomas*, 74 Md. 485, 22 Atl. 403, 13 L. R. A. 380, and note. Of course, rights purely personal, which die with the person, cannot be assigned no matter how acquired. But all contracts are to be construed in the light of the rules and principles of law applicable to the subject-matter of the transaction, and the rights and obligations of the parties are controlled by those rules, except where the written contract discloses an intention to depart therefrom. As applicable to the transaction here before us, the good will of the Sundseth business must be taken to have been dealt with by the parties in the light of the principles of law governing rights and interests of this character, and the contract, properly construed, does not justify the conclusion that the parties intended to extend a mere

personal privilege to the old firm of Haugen & Meier." *Haugen v. Sundseth,* 106 Minn. 129, 118 N. W. 666.

See, also, *Fleckenstein Bros. Co. v. Fleckenstein,* 66 N. J. Eq. 252, 57 Atl. 1025.

In *Sheehan v. Sheehan-Hackley & Co.,* 196 S. W. (Tex. Civ. App.) 665, it was held that, in the absence of an express covenant, there is nothing to prevent the assignor of a business and its good will from setting up and conducting a competing business in the same locality, but that the assignor of the business and good will would not be permitted to do anything which would derogate from his grant.

In *Belmont Laboratories v. Heist,* 300 Pa. 542, 151 Atl. 15, the plaintiff had acquired legitimately a secret process for a medical product. Defendant Heist arranged, with the chemist who perfected the formula for the medical product, to furnish capital and join that chemist as a partner in the business of preparing and selling the product. The chemist and defendant organized plaintiff corporation, to which corporation they transferred their entire interest including the good will and the secret formula. The chemist and defendant each received one thousand shares of the stock of the corporation, which comprised its entire issued capital stock. Defendant gave one share of his stock to one John B. Keenan, Jr., and the three became directors of the corporation. The chemist was made president; defendant was made secretary and treasurer. Differences arose among the three. The chemist and Keenan joined against defendant and discharged him as secretary and treasurer.

Defendant thereupon went to a city in another state where he organized a new corporation and began the manufacture and sale of a remedy which was, in reality, the same remedy manufactured by plaintiff under the formula acquired from the chemist as described above.

Plaintiff endeavored to enjoin defendant from manufacturing and selling the medical product in question. Decree was entered dismissing the action. On appeal the cause was remanded with directions to enter decree for plaintiff. The court said:

"Plaintiff acquired the secret process in a perfectly fair and legitimate manner and paid the consideration therefor according to the agreement. As to that, plaintiff comes into equity with clean hands and is not barred of relief because in some subsequent matter it, acting through the majority stockholders, may have treated the defendant, Heist, unjustly; for this he is entitled to and has invoked another remedy. The rule that he who comes into a court of equity must come with clean hands, is limited to the transaction under investigation. In *D., L. & W. R. R. v. Stroudsburg, W. G. St. Ry.*, 289 Pa. 131, Mr. Justice Schaffer, speaking for the court says (page 138): 'Equity would not stand aside the one whose rights were transgressed and permit them to be appropriated because of his previous bad conduct. "When a court of equity is appealed to for relief it will not go outside of the subject-matter of the controversy and make its inference to depend upon the character and conduct of the moving party in no way affecting the equitable right which he asserts against the defendant or the relief which he demands": Pomeroy's Equity Jurisprudence, 3rd ed., Volume 1, section 399; *Comstock v. Thomson*, 286 Pa. 457, 461; *Dempster v. Baxmyer*, 231 Pa. 28; *Lewis & Nelson's App.*, 67 Pa. 153, 166.' It must be willful misconduct in the very matter in litigation: *Schaeffer v. Jones et al.*, 293 Pa. 529; *Dempster v. Baxmyer, supra; Englander v. Apfelbaum*, 56 Pa. Superior Ct. 145; 21 Cyc. 187. Even proof of misconduct as to one part of a transaction will not necessarily deprive a party of equitable relief as to another part thereof: *Comstock v. Thompson, supra*. The subject here involved is the ownership and right to use or disclose a secret process; not the rights of stockholders in the corporation."

The weight of authority is to the effect that a former employee may be restrained from using for competitive solicitation a list of customers of his former employer; that an employee may not carry away confidential information by copies or in his head and solicit names thus remembered.

"Authorities generally agree that an employee lawfully entering upon a competing business may be enjoined from the use of trade secrets or processes, knowledge of the employer's business surreptitiously obtained or copied lists of customers or information about them. *Stevens v. Stiles,* 29 R. I. 399. The wrong prevented is variously stated, viz., violation of complainant's property rights, or misuse of confidential information given by principal to agent, or violation of a contract implied in law. In the latter some courts import a term into the employee's contract of service that 'He will not after the service is determined use information which he has gained while the service has been subsisting to the detriment of his former employer.' *Essex Trust Co. v. Enright,* 214 Mass. 507, at 511. The two latter grounds are in substance only an application of equitable doctrines to prevent fraud or over-reaching." *Colonial Laundries v. Henry,* 48 R. I. 332, 138 Atl. 47, 54 A. L. R. 343.

In *Morrison v. Woodbury,* 105 Kan. 617, 185 Pac. 735, it was held that the owner of an insurance agency was entitled to an injunction restraining a former employee from soliciting business by use of confidential information obtained, while an employee, from the owner of the insurance agency; that the right to such relief is not affected by the fact that the secrets or confidences are embraced in books or lists to which additions may have been made by efforts of the employee. The court said:

"The law recognizes a property right in trade secrets and confidences. In 14 R. C. L. 402, it is said:

" 'The right thereto is in the nature of a property right in the principal or employer, to protect which a

court of equity may, when its jurisdiction is properly invoked, extend its aid by an injunction restraining the one in whom the confidence has been reposed, from divulging it to third persons or from taking advantage of it himself to the injury of the owner. . . . To entitle a person to this protection it is not necessary that the one intrusted with the secret should have been obligated by the express terms of a contract not to disclose it. . . . In fact it is said that, in the case of an employee, such an obligation exists in the absence of any stipulation to the contrary.'

"It is also said:

" 'Another instance, which is generally regarded as justifying the same relief, is the attempt by an employee to use, either solely for his personal interests or in connection with his services and relations to a new employer, lists of customers, knowledge of which was acquired by reason of his former employment and is regarded as confidential.' (14 R. C. L. 403.)

"It appears in the case at bar that the defendant helped to make the original books and from time to time added memoranda to them showing the dates and expirations of policies which he had written while in the plaintiff's employ. In 14 R. C. L. 403, it is said:

" 'Where such a situation is presented it is held that the right to relief is not affected by the fact that the list may have been added to by the employee's efforts.'

"In *Empire Steam Laundry v. Lozier,* 165 Cal. 95, it was held that—

" 'Knowledge acquired by such employee [the driver of a laundry wagon] during his employment, of the names and addresses of the customers along the route, is in the nature of a trade secret, or confidential communication, and equity will enjoin him, after the termination of his employment, from soliciting or receiving, on behalf of another laundryman, laundry work from any of such customers.' (Syl. 3.)

"The court held in that case that the list of customers, even though in part prepared by the defendant, was the absolute property of the plaintiff, and was a valuable part of its property, citing the case of *Lamb v. Evans* (1893), 1 Ch. 218, where canvassers for a

directory, after leaving the service of their former employer, used the data they had collected to assist a rival publication in procuring advertisements from the same parties. The injunction was granted and the chancellor said:

" 'What right has any agent to use materials obtained by him in the course of his employment and for his employer against the interest of that employer? I am not aware that he has any such right. Such a use is contrary to the relation which exists between principal and agent. It is contrary to the good faith of the employment, and good faith underlies the whole of an agent's obligations to his principal.'

"It has been held that knowledge acquired by the canvassing agent of a grocery company of the names and addresses of its customers is knowledge against the misuse of which equity will protect as being in the nature of a trade secret. (*Hackett v. A. L. & J. J. Reynolds Co.*, 30 Misc. 733, 62 N. Y. Supp. 1076.)

"In *Witkop & Holmes Co. v. Boyce*, 61 Misc. 126, 112 N. Y. Supp. 874, the plaintiff was engaged in the general business in the city of Buffalo of dealing in teas, coffees, spices, etc., and maintained branches in other cities. Much of its business was done through its agents and canvassers who were sent out and given written lists of the names and addresses of customers. It appears in that case that the contract with the defendant contained an express provision by which employees leaving the employ of the plaintiff agreed not to solicit, for another, business from plaintiff's customers. The defendant, after leaving the employ of the plaintiff, entered that of a competitor and immediately commenced soliciting orders from plaintiff's customers. The court granted an injunction, and held that—

" 'Independent of any express contract between the parties, equity will restrain the acts of which the plaintiff complains, and which the defendant threatens and claims the right to do.'

"In the present case, upon the admissions of the defendant, the plaintiff was entitled to the injunctive relief prayed for, and it was error to render judgment against him."

In *Davis & Co. v. Miller,* 104 Wash. 444, 177 Pac. 323, we held that equity will grant an injunction against the solicitation by a former manager of the customers of a loan, real estate, and insurance agency, where the former manager used his personal acquaintance with the customers and his knowledge of the agency's business and confidential matters as a reason for transferring their patronage to a competitor, as respondent Corkery is doing in the case at bar.

Let us assume that Corkery, a former employee of appellant, had the right to engage in a competitive business with appellant in the same community and that he had the right to transact any business for the former customers of appellant and of T. J. Corkery Company who may come to Corkery or his employer, the Securities Company, voluntarily. The authorities are in accord that Corkery had no right to solicit the customers of appellant or the customers of T. J. Corkery or T. J. Corkery Company to transfer their business to T. J. Corkery or to his employer. Whether the information, used by Corkery in soliciting the old customers of appellant, of T. J. Corkery, and of T. J. Corkery Company, was carried away by Corkery in 1939, when he terminated his services with appellant, first having been reduced to writing or carried away in his memory can make no difference. In the first place, the information was such confidential matter acquired by him as an employee of appellant that he will be enjoined from the use thereof as a competitor or as an employee of a competitor of appellant. In the second place, he may not use such information in competitive business, as owner or employee, with appellant, as that would be in derogation of the grant of good will.

Respondent Corkery concedes the universally accepted rule to be that one who sells his good will

cannot thereafter directly solicit his former customers, but he insists upon an exception to that rule to the effect that this restriction applies for only a reasonable time; and that, since he sold the good will to his own corporation in 1933, he was under no legal obligation to refrain from such solicitation in 1939, when it is admitted he commenced such solicitation. It is argued that the rule that the vendor of good will may not solicit business of his old customers, is subject to the qualification that the vendor will not be allowed to decoy away or call back the good will he has sold before the purchaser has had time to attach the good will to himself and make it his very own.

Counsel for respondent Corkery argues: More than six years had elapsed between January 1, 1933, when Corkery sold his good will to T. J. Corkery Company, a corporation, and May 10, 1939, when Corkery started the solicitation of his former customers and former customers of T. J. Corkery Company; that the very limitation of insurance policies of the nature involved in the case at bar is five years, the limitation of most of them is one year and three years; that any customers that Corkery had January 1, 1933, (such customers would be the only ones which were the subjects of the grant of good will made by Corkery at that time) could by renewals and doing business with the T. J. Corkery Company and appellant from January 1, 1933, to May 10, 1939, "in the words of the *Suburban Ice* case, 'no longer be called old customers'" of Corkery, but were rather, by May 10, 1939, customers of T. J. Corkery Company or appellant; and as Corkery was under no restrictive covenant and free to compete with appellant, respondent was free to solicit them.

*Suburban Ice Mfg. & Cold Storage Co. v. Mulvihill,* 21 Ohio App. 438, 153 N. E. 204, does not support the position of respondents. Under that authority appel-

lant has not had sufficient time in which to attach to itself the good will sold to it by Corkery.

The tendency of the courts is to look beyond the corporate form to the purpose of it, and to the officers who are identified with that purpose. T. J. Corkery Company is a corporation which was organized and solely owned by T. J. Corkery. The insurance business of T. J. Corkery and the good will of that business which Corkery sold to his own corporation are the same business, and the same good will, and the same owner.

True, as a general proposition, a corporation is to be regarded as a legal entity, existing separate and apart from the natural persons composing it, but it is not a sacrifice of the logical consistency of a judicial conception to hold that where dominion is so complete as that of T. J. Corkery over T. J. Corkery Company that the corporate entity will be ignored. One is the *alter ego* of the other. To permit the separation between T. J. Corkery and T. J. Corkery Company would work a fraud upon the law.

"The general proposition that a corporation is to be regarded as a legal entity, existing separate and apart from the natural persons composing it, is not disputed; but that the statement is a mere fiction, existing only in idea, is well understood, and not controverted by any one who pretends to accurate knowledge on the subject. It has been introduced for the convenience of the company in making contracts, in acquiring property for corporate purposes, in suing and being sued, and to preserve the limited liability of the stockholders, by distinguishing between the corporate debts and property of the company, and of the stockholders in their capacity as individuals. All fictions of law have been introduced for the purpose of convenience and to subserve the ends of justice. It is in this sense that the maxim *in fictione juris subsistit aequitas,* is used, and the doctrine of fictions applied. But when they are urged to an intent and purpose not within the

reason and policy of the fiction they have always been disregarded by the courts. Broom's Legal Maxims 130. 'It is a certain rule,' says Lord Mansfield, C. J., 'that a fiction of law shall never be contradicted so as to defeat the end for which it was invented, but for every other purpose it may be contradicted.' *Johnson v. Smith*, 2 Burr. 962." *State v. Standard Oil Co.*, 49 Ohio 137, 30 N. E. 279, 34 Am. St. 541, 15 L. R. A. 145.

In *Roberts v. Hilton Land Co.*, 45 Wash. 464, 88 Pac. 946, defendant was a corporation. John Hilton owned ninety-eight of the one hundred shares of the stock of that corporation. He signed a contract authorizing a broker to sell certain land, and after the broker found a purchaser Hilton refused to convey it. It was then discovered that the title to the land was in the Hilton Land Company, the corporation. We said in the course of our opinion:

"In either event, it is the same land and the same owner, and the owner cannot escape responsibility by any such acts of legerdemain as are attempted by the appellant in this case. It will not be allowed to contract the land as Hilton's and then, when it rues the contract, plead the ownership of Hilton Land Company, and *vice versa*." *Roberts v. Hilton Land Co.*, 45 Wash. 464, 88 Pac. 946.

See, also, *Boothe v. Summit Coal Min. Co.*, 55 Wash. 167, 104 Pac. 207; *Clark v. Schwaegler*, 104 Wash. 12, 175 Pac. 300; *DeLano v. Tennent*, 138 Wash. 39, 244 Pac. 273, 45 A. L. R. 766; *Sheffield Co. v. Hoe & Co.*, 173 Wash. 489, 23 P. (2d) 876, and *Pohlman Inv. Co. v. Virginia City etc. Co.*, 184 Wash. 273, 51 P. (2d) 363, to the effect that, where a private person, as in the case of respondent Corkery and his corporation, so dominates and controls the corporation that such corporation is his *alter ego*, a court is justified in piercing the veil of corporate entity and holding that the corporation and private person are one and the same person.

In *Merager v. Turnbull,* 2 Wn. (2d) 711, 99 P. (2d) 434, 127 A. L. R. 1142, defendant sold an undertaking business in Spokane to plaintiff and agreed to refrain from engaging in the same business within the city of Spokane. We held that defendant's breach of the agreement was established where the evidence disclosed that the vendor was interested in a financial and substantial way with his son, and thereafter carried on an undertaking business in the same block under a name similar to that of the business sold to the purchaser. Despite the argument that the son was not a party to the contract of sale by which his father sold the undertaking business to plaintiff, we affirmed the decree which enjoined the father from engaging in the undertaking business within the limits of the city of Spokane and enjoined the son from engaging in the undertaking business within the city of Spokane under any name or designation embracing the surname of his father and himself other than his own individual name of Bruce Turnbull. We were of the view that the lease by the father of the building owned by him to be used by his son did not reflect the true relationship of the parties, and that to permit the son to conduct the undertaking business practically next door to the undertaking business purchased by plaintiff from the father would render valueless the rights of the purchaser under his contract with the father and the injunction against the father solely would be a futile gesture.

The next question is whether the "clean hands" doctrine—"He who comes into equity must come with clean hands"—bars injunctive relief to appellant.

"It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have a standing in court he must first show that not only has he a good and meritorious cause of action, but he must come into the court with clean

hands. He must be frank and fair with the court, nothing about the case under consideration should be guarded, but everything that tends to a full and fair determination of the matters in controversy should be placed before the court. The complainant ought not to be the transgressor himself, and then complain that by chance he has been injured on account of his own wrongful misconduct. When, as is sometimes the fact, the original wrong-doer is the party who sustains the greater injury by reason of his inequitable scheme or plan, he ought to bear the burden and the consequences of his own folly, and the equity court will not lend him its jurisdiction to right a wrong of which he himself is the author. Equity leaves the parties in pari delicto to fight out their own salvation and remedy their own wrongs in the law court. Equity will not assume jurisdiction where both parties are in the wrong. The purpose of equity is to afford to the complainant a full, complete, and adequate remedy, and it will not undertake to balance the equities between the parties when they are both in the wrong, nor give the complainant relief against his own vice and folly. When the plaintiff has been guilty of a fraud which tends to producing the injury of which he seeks redress, his conscience, in equity, is void of offence, and hence it cannot, with any propriety be said that his hands are unclean, for 'unclean hands', within the meaning of the maxim of equity, is a figurative description of a class of suitors to whom a Court of Equity as a court of conscience will not even listen, because the conduct of such suitors is unconscionable, i. e. morally reprehensible as to known facts. . . .

"It is not every time that one has practiced an unconscionable bargain upon another, or there has been a lack of good faith and those matters that are usually present when men deal with each other at arm's length, and the parties are capable of protecting themselves and their own rights, that a court of equity will refuse its aid to a complaining party. It is only where the inequitable conduct complained of as ground for refusing its jurisdiction has actually been practised with reference to the matter then under consideration in the case at bar. It may happen that one who habitually

takes an undue advantage over his customers in their business dealings, and this is a matter of common observation, at some times in his experience has dealt fairly and justly with his customers, and in the absence of evidence of an unconscionable advantage taken in the very case at bar, it is no ground for refusing jurisdiction, that the general character and conduct of the complainant has been tainted with fraudulent and unfair practice. The principle does not repel all sinners from courts of equity, nor does it disqualify any claimant from obtaining relief there who has not dealt unjustly in the very transaction concerning which he complains. The inequity which will repel him must have an immediate and necessary relation to the equity for which he sues. It must be understood to be willful misconduct in regard to the matter in litigation, and not to misconduct, however gross, which is unconnected therewith, and with which the opposite party in the cause has no concern. . . .

"Courts are ordained for the enforcement and vindication of the law and legal rights. They never aid anybody in his effort to violate law nor give him the benefit or fruit of his own violation thereof. No court of law or equity will enforce or give any right upon an illegal contract. Following the same principle, a court will not allow the use of its powers and process to obtain a benefit founded directly upon a breach of law by the applicant therefor. Courts of Equity go still further and refuse relief, even in cases of equitable right, if the applicant has been guilty of fraud or misconduct in or about the matter in respect to which he seeks relief." 1 Story's Equity Jurisprudence (14th ed.), §§ 98, 100, 102.

In *Benson v. Sawyer*, 216 Iowa 841, 249 N. W. 424, the supreme court of Iowa held that the rule that plaintiff, seeking relief in equity, must come into court with clean hands, has reference only to relation between parties, and arising out of transaction. A party is not barred from relief because of misconduct not connected with matter in controversy, although directly connected with subject-matter of suit.

"The misconduct which falls within this maxim must have infected the cause of action, so that to entertain it would be violative of conscience. It must relate directly to the very transaction concerning which complaint is made, and not merely to the general morals or conduct of the person seeking relief. A party is not barred from relief because of misconduct not connected with the matter in controversy; and this is true, although the misconduct may be directly connected with the subject matter of the suit. . . . One does not always forfeit a right fairly acquired by subsequent misconduct connected therewith." 21 C. J. 187. See, also, *Carr v. Craig*, 138 Iowa 526, 116 N. W. 720, 723; and annotations 4 A. L. R. 44, 65.

In *Lavretta v. First Nat. Bank of Mobile*, 235 Ala. 104, 178 So. 3, it was held that the maxim that "He who comes into equity must come with clean hands" is based on conscience and good faith, hence bad faith or unconscionable conduct which fall within maxim must rest upon positive or willful wrong and must involve intention as opposed to a *misapprehension of legal rights*.

In *Comstock v. Thompson*, 286 Pa. 457, 133 Atl. 638, the "clean hands" doctrine was held inapplicable as the wrongful act was committed under an honest belief as to its validity.

Appellant's insistence upon its interpretation of the employment agreement, which construction of the contract is contrary to that of respondent Corkery, does not bring appellant within the ban of the "clean hands" doctrine; otherwise, the honest failure of a party to a contract to perform that which the other party deemed, and was later so found by the court to be, a material obligation of the contract would deprive the first party of his right of appeal from the decision. The fact that the relationship between Corkery and appellant was terminated by the former May 10, 1939, because, as the court found, appellant refused to account as to

profits in accordance with the employment agreement, does not constitute such misconduct on the part of appellant as to bring it within the maxim that "He who comes into equity must come with clean hands."

The authorities are in accord that the "clean hands" principle does not repel a sinner from courts of equity, nor does it disqualify any claimant from obtaining relief there who has not dealt unjustly in the very transaction concerning which he complains. The inequitable conduct must have a direct relation, which it does not in the case at bar, with the very transaction concerning which the plaintiff complains. Patently, the rule that "He who comes into equity must come with clean hands" is inapplicable, as appellant is not required to set up its wrongful conduct as a basis of its right to injunctive relief.

The claimed inequitable conduct of appellant in not paying Corkery what the court found it owed him was an entirely different transaction from the one in which appellant seeks relief. That is, appellant is endeavoring to restrain Corkery from impairing the good will which appellant purchased and for which it paid; Corkery is seeking recovery of unpaid commissions growing out of a contract of employment. There is no evidence of deceit, false representations, or dishonest behavior on the part of appellant, who has at all times insisted—it must be presumed in good faith— that the employment agreement on which Corkery endeavors to recover is different from that which is in the mind of appellant. Clearly, to apply the "clean hands" doctrine would permit penalizing one who comes into court to assert what he honestly believes are his legal rights.

While the court did not find that Anchor Securities Company and Gimble aided or abetted Corkery in using confidential information acquired by Corkery

from his former employer (appellant), or in breaching the contract under which appellant purchased the business and good will from T. J. Corkery Company, the court did find that Securities Company and Gimble had sufficient information to put them on inquiry respecting the relationship between Corkery and appellant, which finding is supported by ample evidence. The only reasonable inference from that evidence is that, immediately following Corkery's employment by Securities Company, that company commenced to use Corkery to solicit business which had been sold to appellant. The Securities Company and Gimble will not be heard to say that they did not know what Corkery, their employee, was doing.

Appellant is entitled to an injunction restraining respondents from soliciting T. J. Corkery's, and T. J. Corkery Company's, former customers and from using any information, secured by Corkery from expiration lists or otherwise while a confidential employee of appellant, in soliciting insurance. Appellant is also entitled to recovery against respondents for loss sustained as a result of respondent's tortious acts. A new trial should be granted for determination of the amount of damages which should be awarded to appellant.

The judgment is reversed and the cause remanded for proceedings in harmony with the foregoing opinion. Appellant will recover costs in this court.

ROBINSON, C. J., BEALS, SIMPSON, and JEFFERS, JJ., concur.